# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 10, 2016 Session

## STARLINK LOGISTICS INC. v. ACC, LLC, ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 121435II     Carol L. McCoy, Chancellor**

---

### No. M2014-00362-SC-R11-CV – Filed May 9, 2016

---

After its closure, a Class II landfill continued to discharge contaminants into a creek that flowed into a lake located on adjoining property. Following years of investigations and multiple failed remedial measures, the landfill owner and the state agency with authority to direct landfill cleanup operations agreed that the most feasible, practical, and effective way to abate the discharge was for the landfill owner to divert water from entering the landfill and, over a four-year period, to remove and relocate the landfill waste. The neighboring landowner of the property on which the lake affected by the discharge was located objected to the plan, arguing that the landfill owner should also be required to treat or divert water leaving the landfill site. The Tennessee Solid Waste Disposal Control Board ("the Board") heard the case and approved the landowner's plan of action and did not require diversion of the water leaving the landfill. The neighboring landowner appealed, and the trial court affirmed the Board's decision. The Court of Appeals, dissatisfied with the ruling, remanded the case to the Board to take additional proof on whether the neighboring landowner was willing to pay for the costs of diverting the discharge, the costs of implementing the diversion option, and the landfill owner's ability to pay for the diversion plan. We granted the Board's application for permission to appeal. We hold that the Court of Appeals failed to properly apply the judicial review provisions of Tennessee Code Annotated section 4-5-322(h) (2011) and substituted its judgment for that of the Board. The judgment of the Court of Appeals is reversed.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Court of Appeals

SHARON G. LEE, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Elizabeth P. McCarter, Senior Counsel, for the appellant, Tennessee Solid Waste Disposal Control Board.

William L. Campbell, Jr., Nashville, Tennessee; Sheryl G. Snyder, Louisville, Kentucky; and Wm. T. Robinson III, Christopher S. Habel, and Stephen N. Haughey, Cincinnati, Ohio, for the appellee, StarLink Logistics Inc.

Sharon O. Jacobs and C. David Briley, Nashville, Tennessee, and Thomas W. Hardin and Kori A. Bledsoe, Columbia, Tennessee, for the appellee, ACC, LLC.

Donald Capparella and Elizabeth Sitgreaves, Nashville, Tennessee, for the Amici Curiae, Gene Barker, Linda Barker, Claude Brawner, Faye Brawner, Eldon R. Cummins, Sara Cummins, Dwight Green, David Greenfield, James Earl Jones, Gail McCain, Morris Ray McCain, Jimmy E. McKennon, Larry Patton, Sue Powell, Charles Spears, Billy Ray Thompson, Fred Thompson, and Colin S. Underwood.

## OPINION

### I.

In 1981, the Tennessee Department of Environment and Conservation ("TDEC") issued ACC, LCC ("ACC") a permit to construct and operate a Class II landfill in Maury County.[1] The landfill was located on approximately fourteen acres of the 48.02 acre parcel owned by ACC. ACC disposed of aluminum recycling wastes from Smelter Service Corporation's local aluminum smelting plant. The waste consisted almost exclusively of bag-house dusts and "salt cake" slag. The salt cake slag contained high concentrations of highly soluble sodium chloride and potassium chloride. ACC operated the landfill from 1981 to 1993. In July 1995, ACC submitted a certification of completion of closure to TDEC, and in April 1996, TDEC issued an acceptance of closure to ACC.

TDEC and ACC learned, within a few years of when the landfill became operational, that high levels of chlorides and ammonia were being discharged from the landfill into groundwater and surface water that drained into Sugar Creek and Arrow Lake. The leaching of chloride and ammonia continued after the landfill's closure and caused areas west of the landfill, including Sugar Creek and Arrow Lake, to become

---

[1] When the permit was issued, TDEC was known as the Tennessee Department of Public Health and ACC was known as Associated Commodities Corporation. The facts and procedural history in the opinion are taken from the Amended and Restated Consent Order as presented by TDEC and ACC to the Davidson County Chancery Court for approval. Starlink did not take issue before the Tennessee Solid Waste Disposal Control Board with any of the facts stated in the proposed Amended and Restated Consent Order.

polluted. ACC worked with TDEC to identify and remedy the leaching. ACC performed extensive investigative efforts to determine the cause of the leaching and performed multiple remedial measures but was unsuccessful in abating the pollution.[2] In December 2003, at TDEC's request, ACC submitted a Corrective Action Plan ("the Plan") that evaluated available data, described the limitations of available options due to the site conditions, and identified three remaining options to mitigate the release of contaminated leachate from the landfill: clean closure/waste removal, leachate collection/treatment, and natural or enhanced site attenuation. The Plan presented an assessment of the feasibility and potential effectiveness of these options and concluded that a remedy that fulfilled all criteria in Tennessee Compilation of Rules and Regulations Chapter 1200-1-7-.04(7)(a)8(ii)[3] within two to three years was not technically and economically practical. After a January 2004 public meeting, TDEC approved ACC's plan to build a wetlands system downgradient of the site to retain and buffer leachate and improve water quality and habitat. The wetlands system was constructed but was not successful.

In June 2008, TDEC requested that ACC submit a modified plan because the rate of discharge of contaminants from groundwater was increasing. In August 2008, ACC submitted a modified plan ("the Modified Plan") that TDEC approved in April 2010. The Modified Plan acknowledged that the discharge problem stemmed from a failure to accurately characterize the landfill's hydrogeology features during the permitting and development process, identified options for reducing the release of chlorides from the landfill and for removal of the contaminated material, and provided a strategy and

---

[2] Remedial measures included application of daily cover material to divert rainfall from the wastes; construction of ditches to reroute surface water around the landfill; construction of multiple settling ponds and drainage control ditches; attempted sealing of springs and seeps; installation, development, and maintenance of a system of groundwater monitoring wells to delineate the nature and extent of groundwater contamination; collection and analysis of surface and groundwater samples; soil boring/rock coring with installation of piezometers along the landfill perimeter and test pit/trench excavations within the landfill to evaluate groundwater flow into the landfill; performance of dye tracer studies to define groundwater flow and karst impact near the landfill; investigation of landfill area for karst conditions; performance of electrical resistivity and microgravity surveys of the landfill to define water flow paths beneath the landfill; and geoprobe and rotary auger investigations to evaluate depth to bedrock and groundwater conditions.

[3] These criteria required corrective measures to:
(I) Be protective of human health and the environment,
(II) Attain the groundwater protection standard as specified pursuant to Rule 1200-01-07-.04(7)(a) 1 of this rule.
(III) Control the source(s) of releases so as to reduce or eliminate, to the maximum extent practicable, further releases of Appendix II constituents into the environment that may pose a threat to human health or the environment; and
(IV) Comply with standards for management of wastes as specified in subpart (iv) of part 9 of this subparagraph.

Tenn. Comp. R. & Regs. 1200-1-7-.04(7)(a)8(ii) (2003).

schedule to evaluate, select, and implement ways to address the contaminated discharge. The first step was a preliminary evaluation of potential corrective action options, followed by a report to TDEC that would identify options as not feasible or potentially feasible, provide additional information for a more complete evaluation of potentially feasible options, and describe the field investigations or other efforts necessary to gather the additional information.

Under the Modified Plan, ACC submitted a preliminary report to TDEC in August 2010, detailing ACC's efforts since April 2010. The report requested that TDEC clarify its corrective action goals, summarized current site conditions, identified corrective action alternatives, summarized planned additional data gathering efforts to evaluate the feasibility of remaining alternatives, described the future corrective action plans, and recommended a meeting to discuss prioritization and timing of additional necessary efforts.

In January 2011, representatives of ACC and TDEC's Divisions of Solid Waste Management and Water Pollution Control met to discuss the necessary level of contaminant reduction for Sugar Creek. ACC discussed the potential remedy of removing the waste from the landfill and planned to do test excavations of waste material to assess the feasibility of the remedy.

In February 2011, TDEC personnel inspected the landfill and took water samples at points along Sugar Creek that confirmed that discharge from the landfill caused high levels of chlorides, ammonia, and dissolved solids in Sugar Creek downstream of the landfill.

In June 2011, ACC and TDEC entered into an administrative consent order stating that the release of contaminated discharge from the landfill constituted violations of the Water Quality Control Act of 1977, Tenn. Code Ann. §§ 69-3-101 to -148 (2011), and the Tennessee Solid Waste Disposal Act, Tenn. Code Ann. §§ 68-211-101 to -124 (2011). The proposed order provided for remedial actions to address the continuing discharge from the landfill. ACC agreed to submit a discharge reduction plan to significantly reduce the amount of contamination flowing from the landfill site in surface water and to develop and implement a plan to effectively and permanently prevent the release of landfill waste to the groundwater. The consent order was filed in the Davidson County Chancery Court, under Tennessee Code Annotated sections 68-212-114(e) (2011), 68-212-215(f) (2011), and 69-3-115(e) (2004 & Supp. 2011).

StarLink Logistics Inc. ("StarLink"), which owns approximately 1500 acres immediately west of the landfill and on which Arrow Lake is located, intervened and objected to the consent order. After the parties could not reach an agreement, the Davidson County Chancery Court remanded the matter to the Board for a contested

4

hearing. On remand, ACC and TDEC negotiated an Amended and Restated Consent Order ("Amended Order"), which was presented to the Board for approval.

The proposed Amended Order required ACC, among other things, to:

1. Within 120 days of the effective date of the proposed Amended Order and before the commencement of any corrective action, construct a berm upgradient from the site to divert uncontaminated storm water away from the site; and

2. Within four years or less from the effective date of the proposed Amended Order, remove from the landfill site, to the extent practicable, all solid waste that has the potential for future contact with ground or surface water. All waste must be removed to an approved landfill cell on ACC's property or to a permitted off-site landfill. After ACC begins removal of the waste, it must capture groundwater entering the excavated area, analyze its chemical characteristics, and redirect it back into the landfill or discharge it into Arrow Lake if the water meets certain water quality criteria.

To promote compliance, the proposed Amended Order assessed a $400,000 penalty to ACC due and payable in four yearly installments of $100,000 if ACC failed to meet yearly milestones for the removal of waste.

On August 7, 2012, the Board held a contested hearing regarding approval of the proposed Amended Order. TDEC and ACC urged the Board to approve the proposed Amended Order, contending that the only way to remedy the contamination coming from the closed landfill was to divert storm water away from the landfill site and to remove the waste from the landfill. StarLink objected to the proposed Amended Order, asserting, among other things, that the proposed plan did not adequately address the continued discharge of leachate into Sugar Creek and onto StarLink's property.

In response to preliminary questions from Board members, Nancy Sullivan, a professional engineer with Triad Environmental Consultants ("Triad"), explained that at least 250,000 cubic yards of waste would need to be removed from the site. Chris Scott, a professional geologist with Triad, explained that he had been working on the landfill site for several years and that after failed attempts to address surface water contamination, it became clear that groundwater was the major source of the problems with the landfill. Mr. Scott explained that groundwater had been entering the landfill from the north and east sides of the landfill, and the first phase of the proposed plan was removal of waste from the landfill's northern side. George Garden, an engineer with the engineering firm Barge, Waggoner, Sumner & Cannon, stated that based on his measurements of the water flow rate and contaminant concentrations of the landfill for the past year, there was no single point of contact between the landfill waste and groundwater. Although he had studied ways to remove contaminant materials from the water as it left the landfill area, Mr. Garden was of the opinion that the only way to

5

permanently address the problem was removal of the waste to another location. According to Mr. Garden, the cost of treating the discharge would be high and roughly equal to the cost of removing some of the waste material. From an economic standpoint, Mr. Garden opined that it would be better to focus ACC's resources on removing the landfill's waste material as opposed to treating discharge that leaves the landfill area.

StarLink called as its first witness, Dennis Schucker, a professional geologist and associate director with BHE Environmental, who prepared an investigation work plan report for the StarLink property that indicated elevated levels of chloride and ammonia in ground and surface water and soil samples. Mr. Schucker expressed concern that during the time the waste was being removed, the site would continue to leach chloride and ammonia into the streams. He presented no alternative plan to remedy the groundwater or surface water issue.

StarLink's next witness was Michael Bogdan, Director of Retained Environmental Matters with Sante Fe, a healthcare company, of which StarLink was an indirect subsidiary. Mr. Bogdan testified that he agreed with the proposed Amended Order's requirement that a berm be constructed, but insisted that it should have been done many years ago and should be installed sooner than 120 days. He took issue with the proposed Amended Order's requirement that the plan "significantly reduce[]" the discharge of contaminants via surface water and instead should have required a definitive amount of reduction. He also stated that the proposed Amended Order should not provide for reductions in discharge "to the extent practicable" but instead should have specific requirements for ACC to meet. He then stated that the proposed Amended Order should apply Tennessee water quality criteria to water leaving ACC's property in addition to the water entering the landfill excavation area.

Mr. Bogdan testified that the crux of StarLink's complaint with the proposed Amended Order was that it allowed ACC to continue releasing untreated discharge into Sugar Creek and onto StarLink's property for at least four more years while the waste is being removed. When asked about alternative remedies, Mr. Bogdan asserted that simply removing the waste material would not solve the groundwater contamination on StarLink's property. He further stated that StarLink wanted the release of contaminated discharge onto StarLink's property to stop immediately and for any discharge leaving ACC's property to meet the Tennessee water quality criteria as outlined in the proposed Amended Order. When asked about the specific technology StarLink was proposing to meet these goals, Mr. Bogdan suggested that ACC construct a slurry wall around its property line and extract and treat groundwater from behind the wall. When asked by a Board member if there are karst[4] formations on the property, Mr. Bogdan responded that

---

[4] Karst is defined as "an irregular limestone region with sinkholes, underground streams, and caverns." *Karst*, Mirriam-Webster, http://www.merriam-webster.com/dictionary/karst (last visited April 12, 2016).

although karst formations existed on the property, he had not observed any in the particular area of discussion. Mr. Bogdan stated that the capture of some groundwater was possible and indicated that he thought contaminated discharge was leaving ACC's property through a retention pond.

Dr. Schucker was recalled to testify and explained that bedrock formations existed six to twenty feet below the surface, and it was unknown whether groundwater existed below that level of bedrock. Based on the depth of bedrock, Dr. Schucker opined that groundwater existing less than twenty feet below the surface of the bedrock could be captured with a slurry wall, but Dr. Schucker had not performed a feasibility analysis on that option. The cost was also unknown.

ACC presented the testimony of Tom Grosko, who was employed by Smelter Service, an aluminum recycling company in Maury County that is the sole member of ACC's limited liability corporation. Mr. Grosko testified that ACC's objective was to correct the situation by removing the waste from the landfill and stopping the contaminated water from crossing the property line. He stated that ACC was not financially able to remove the waste from the landfill and also treat water discharging from the landfill. Therefore, ACC decided it was best to focus on the root cause of the contamination by removing the waste. Counsel for StarLink asked Mr. Grosko if there had ever been a proposal to pipe the water from the waste disposal site to other property owned by ACC and if StarLink had offered to pay for the pipe. Mr. Grosko responded that he had heard of the proposal, did not personally reject the idea, and did not recall who had rejected it. Mr. Grosko later stated that no net environmental benefit would result from piping the contaminated discharge from one area to another.

ACC next presented the testimony of Mike Apple, retired director of the Tennessee Division of Solid Waste Management, who had many years of experience dealing with solid waste disposal facilities. Mr. Apple had reviewed the proposed Amended Order and, in his opinion, the corrective action in the proposed Amended Order would abate the problem, was reasonable, and was in the best interest of the public. Mr. Apple testified that when ACC investigated potential solutions to the discharge problem, it could not find the source of the water infiltrating the landfill. Mr. Apple stated that the flow of groundwater, its direction, and its depth are all unknowns, which is the reason the proposed Amended Order did not address water infiltration.

ACC then presented further testimony from Ms. Sullivan. Ms. Sullivan testified that under the first phase of ACC's waste removal plan, ACC would work to redirect groundwater infiltrating the landfill, which, if at least partly successful, would immediately improve the quality of discharge leaving the landfill. This, combined with a downgradient surface water impoundment, would improve the quality of the water flowing into Arrow Lake. Ms. Sullivan admitted that the proposed Amended Order did not provide for the evaluation of water entering Arrow Lake and any subsequent remedial

7

action based on such an evaluation. Ms. Sullivan also admitted that the proposed Amended Order provided for the sampling and testing of discharge from the landfill, but did not provide for any specific action based on the results of these tests. Ms. Sullivan further acknowledged that the proposed Amended Order did not provide for specific criteria to determine the success of the proposed Amended Order. Upon examination by TDEC, Ms. Sullivan explained that any plans called for by the proposed Amended Order could be modified in the future.

Upon further examination by StarLink, Ms. Sullivan stated that the proposed Amended Order focused on capturing the water entering the landfill because it would be more cost-effective than capturing the water leaving the landfill. Ms. Sullivan explained that if the proposed Amended Order permitted water to enter the landfill area, the water would have to be treated. The water, however, would not have to be treated if it was captured before it entered the landfill. The proposed Amended Order contemplated that the money saved by not treating the water entering the landfill would be used to remove the landfill waste material.

ACC's last witness was Mr. Garden. ACC hired Mr. Garden's employer, Barge, Waggoner, Sumner & Cannon, to explore the most cost-effective way to treat the water. Mr. Garden stated there was no possible way to completely remove both the ammonia and salt content from the landfill discharge so as to comply with water quality standards without taking all of the salt out of the water. The complete removal of the salt from the discharge would leave a high saline water residue, requiring the residue to either be dumped into a very large source of water or forced to evaporate. Mr. Garden testified that ACC could not legally dump the residue and that high levels of heat would be needed to evaporate the residue. Mr. Garden explained that he had explored ways to generate heat sufficient to evaporate the residue, but all were too dangerous to justify. Moreover, the cost to build a plant to treat the salt in the discharge would be the same whether built before or after removing the waste material from the landfill. Even if such a plant were built, it could only lower the level of salt leaving the landfill site by single percentage points, which would make Mr. Garden unlikely to detect any impact from the plant on Arrow Lake. Mr. Garden could not specify exactly when the benefit from removing the waste might materialize.

Upon examination by StarLink, Mr. Garden testified that there are multiple points at which contaminated discharge leaves ACC's property and enters StarLink's property. He believed that the volume of salt in the water leaving the landfill would exceed the ability of the local wastewater treatment plant in Mt. Pleasant to handle and discharge the water. Mr. Garden estimated the cost of a plant to treat 30,000 gallons of the most concentrated discharge—a small portion of the flow—would cost about $5 million to construct and about $700,000 annually to operate, depending on how the facility was managed. Mr. Garden explained that the only facility known to him and ACC able to handle the anticipated volume of discharge was in New Jersey.

8

During closing arguments, StarLink's counsel mentioned the earlier proposal by StarLink to pay to pipe discharging water away from Arrow Lake. Before the Board began deliberations, the administrative law judge charged the Board members to make their decision based on the sworn testimony of witnesses and exhibits introduced as evidence.

During deliberations, Board members discussed the pros and cons of the proposed Amended Order. Board member Elaine Boyd commented that it would not make sense for ACC to focus its financial resources on treating the symptom of contaminated discharge when doing so would prohibit ACC from allocating its resources to the root cause of the problem—the waste material. Board member Glenn Youngblood commented that until the waste material in the landfill is addressed, all parties involved would just be "spinning [their] wheels" and later commented that a consent order that bankrupts ACC would benefit no one. Board member Michael Atchison echoed Board member Youngblood's concern. Board member Jared Lynn stated that even if a strategy was implemented piping surface water discharge to another location, this would not affect the continuing groundwater discharge and that removing the waste materials would be the most effective use of ACC's resources. Board member Mark Williams noted that nothing in the proposed Amended Order eliminated TDEC's ability to continue enforcement actions. Board member Franklin Smith questioned why the proposed Amended Order could not provide for a combination of remedies, combining the terms in the consent order and StarLink's proposal to pay to pipe discharging water to another location. In response, Board member Boyd said that given the subsurface geological conditions, she thought that there would be some complexity in capturing groundwater leaving the site given all of the points of discharge. Board Chairman Ken Donaldson noted that StarLink was willing to pay for the proposal to divert discharging water. Board member Atchison responded that while it appeared StarLink offered to do so in the past, it was unclear whether that offer still stood at the time of the hearing. Board member Boyd commented that if the Board brought StarLink on as a party to the proposed Amended Order for more negotiation, further delay would occur before the root source of the problem—the waste material—was addressed. Upon a question by Board member Youngblood, the administrative law judge informed the Board that StarLink had a private right of legal action against ACC. The judge also informed the Board it could reopen the record to hear further evidence if it wished to do so.

The Board voted to approve the proposed Amended Order, stating in its Order that "remediation of the ACC Landfill in the manner specified in the [proposed Amended Order] is necessary to protect the health, safety and welfare of the public." StarLink appealed the Board's decision to the Chancery Court for Davidson County. On January 29, 2014, the Davidson County Chancery Court affirmed the Board's approval of the proposed Amended Order. StarLink appealed.

In the Court of Appeals, StarLink asserted that the Davidson County Chancery Court erred in affirming the Board's approval of the proposed Amended Order, raising four issues. On its own, the Court of Appeals raised the issue of "whether the Board's adoption of the [Amended] Order was in error where the Board failed to fully consider a feasible and potentially economically viable plan that would contain the leachate contamination from the landfill site from continued discharge into Sugar Creek and Arrow Lake[.]" *Starlink Logistics Inc. v. ACC, LLC*, No. M2014-00362-COA-R3-CV, 2015 WL 1186311, at *4 & n.7 (Tenn. Ct. App. March 11, 2015); *see also* Tenn. R. App. P. 13(b). The Court of Appeals reversed the Davidson County Chancery Court's decision, "find[ing] the Board's decision to be arbitrary and capricious inasmuch [as] it failed to fully consider the range of remedial options which were available and discussed at the hearing before the Board." *Starlink Logistics Inc.*, 2015 WL 1186311, at *7. The intermediate appellate court remanded the matter for further proceedings. *Id.* at *10.

We granted the Board's application for permission to appeal. The issue before us is whether the Court of Appeals properly applied the narrow standard of review required for judicial review of agency decisions under Tennessee Code Annotated section 4-5-322(h).

## II.

It is not disputed that the Commissioner of TDEC had the authority to enter into a consent order with ACC to remediate the closed landfill site. *See* Tenn. Code Ann. § 68-212-224(a)(1) (2011). Tennessee Code Annotated section 68-212-224(e) requires the terms of such a consent order to be based on the criteria established in Tennessee Code Annotated section 68-212-206(d). Those criteria provide:

> (1) In selecting containment and clean up actions, including monitoring and maintenance, . . . the commissioner shall evaluate reasonable alternatives and select those actions which the commissioner determines are necessary to protect public health, safety, and the environment. The goal of any such action shall be clean up and containment of the site through the elimination of the threat to the public health, safety, and the environment posed by the hazardous substance. In choosing the necessary actions at each site, the commissioner shall consider the following factors:
> > (A) The technological feasibility of each alternative;
> > (B) The cost-effectiveness of each alternative;
> > (C) The nature of the danger to the public health, safety, and the environment posed by the hazardous substance at the site; and
> > (D) The extent to which each alternative would achieve the goal of this subsection (d).

Tenn. Code Ann. § 68-212-206(d) (2011).

10

TDEC and ACC reached an agreement, contained in the proposed Amended Order, for the cleanup of the landfill site. StarLink intervened and objected to the plan. Following a contested hearing, the Board approved the proposed Amended Order. StarLink, aggrieved by the Board's decision, sought judicial review under Tennessee Code Annotated section 4-5-322.

The Uniform Administrative Procedures Act ("the Act"), Tenn. Code Ann. §§ 4-5-101 to -404 (2011), sets forth the extent of judicial authority to review agency decisions. *See* Tenn. Code Ann. §§ 4-5-301 to -325. Pursuant to Tennessee Code Annotated section 4-5-322(b)(1)(A), StarLink filed a petition for judicial review in the Chancery Court for Davidson County. StarLink alleged no procedural irregularities; therefore, under section 4-5-322(g), the Davidson County Chancery Court's review was confined to the record, and no new proof was taken.

The reviewing court's standard of review is narrow and deferential. *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). The decision of the agency may be reversed or modified if the decision is shown to be:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
  (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

This narrow standard of review, as opposed to the broader standard of review applied in other appeals, reflects the general principle that courts should defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise. *Tenn. Envtl. Council, Inc. v. Tenn. Water Quality Control Bd.*, 254 S.W.3d 396, 401-02 (Tenn. Ct. App. 2007) (citing *Willamette Indus., Inc. v. Tenn. Assessment Appeals Comm'n*, 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999); *Wayne Cnty.*, 756 S.W.2d at 279; *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980); *Metro. Gov't of Nashville v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977)). Courts do not review questions of fact de novo and, therefore, do not second-guess the agency as to the weight of the evidence. *Humana of Tenn. v. Tenn. Health Facilities Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977); *Grubb v. Tenn. Civil Serv.*

*Comm'n*, 731 S.W.2d 919, 922 (Tenn. Ct. App. 1987) (citing Tenn. Code Ann. § 4-5-322(h); Tenn. Code Ann. § 4-5-323; *Reece v. Tenn. Civil Serv. Comm'n*, 699 S.W.2d 808, 809 (Tenn. Ct. App. 1985)). This is true even if the evidence could support a different result. *Wayne Cnty.*, 756 S.W.2d at 279 (citing *Hughes v. Bd. of Comm'rs*, 319 S.W.2d 481, 484 (Tenn. 1958)).

The Act makes clear that a reviewing court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Tenn. Code Ann. § 4-5-322(h)(5)(B). An appellate court applies the same limited standard of review as the trial court. *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 264 (Tenn. 2009); *Ware v. Greene*, 984 S.W.2d 610, 614 (Tenn. Ct. App. 1998).

A decision of an administrative agency is arbitrary or capricious when there is no substantial and material evidence supporting the decision. *Pittman v. City of Memphis*, 360 S.W.3d 382, 389 (Tenn. Ct. App. 2011); *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n.*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993). The statute does not define "substantial and material evidence," but it is less than a preponderance of the evidence, *Wayne Cnty.*, 756 S.W.2d at 280 (citing *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)), and more than a "scintilla or glimmer" of evidence, *id.* (citing *Pace v. Garbage Disposal Dist.*, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965)). A decision with evidentiary support can be arbitrary or capricious if it amounts to a clear error in judgment. *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) (citing *Jackson Mobilphone Co.*, 876 S.W.2d at 110). A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Civil Serv. Comm'n*, 216 S.W.3d at 316 (quoting *Jackson Mobilphone Co.*, 876 S.W.2d at 111). "If there is room for two opinions, a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though [a reviewing court] think[s] a different conclusion might have been reached." *Bowers v. Pollution Control Hearings Bd.*, 13 P.3d 1076, 1083 (Wash. Ct. App. 2000) (citing *Buechel v. Dep't of Ecology*, 884 P.2d 910, 915 (Wash. 1994) (en banc)) (explaining the "arbitrary or capricious" standard under Washington's version of the Uniform Administrative Procedures Act). The "arbitrary or capricious" standard is a limited scope of review, and a court will not overturn a decision of an agency acting within its area of expertise and within the exercise of its judgment solely because the court disagrees with an agency's ultimate conclusion. *See id.* (citing *Buechel*, 884 P.2d 910 at 915).

Applying this limited standard of review to the Board's decision, we hold that the decision was not arbitrary or capricious. The Board, relying on its expertise and experience, carefully considered the evidence presented to it. The Board's decision was fully supported by substantial and material evidence. It was based on reasoning and exercise of judgment and did not disregard any facts, without some basis, that would lead a reasonable person to reach the same result. While the Board may have chosen other

12

remedies, its decision was sound, well-reasoned, and supported by the evidence. The Board's decision was not arbitrary merely because the reviewing court might have reached a different decision.

For more than eight years, TDEC and ACC wrestled with the problem of contaminated water leaving the landfill site and entering Sugar Creek and Arrow Lake. ACC thoroughly investigated the condition of the landfill and its hydrogeology features, compiled data on the landfill site and remedial options, prepared and submitted reports to TDEC, reviewed the feasibility and effectiveness of various remediation options, and unsuccessfully attempted multiple remediation efforts. The issue of leachate flowing out of the landfill was clearly a difficult problem to resolve. In 2011, TDEC and ACC arrived at a solution that they considered to be reasonable, feasible, cost-effective, and practical. In simple terms, the agreement required ACC to divert water from entering the landfill site and, over a four-year period, remove all of the waste from the landfill and relocate it to an approved landfill cell on its property or to a permitted off-site location. This plan of action was supported by expert testimony. StarLink's primary bone of contention was that the proposal did not require ACC also to divert or treat water leaving the landfill site during the waste removal process. StarLink, arguing that more should be done to prevent contaminated water from flowing into Arrow Lake, offered no other feasible alternative plan. During the Board hearing, StarLink's counsel referenced a diversion option during cross-examination of ACC's witness, Mr. Grosko:

> Q: And so what I'm asking you now is, why aren't we focusing on diverting the water below?
> A: Around what? If it's already been through the landfill, I don't understand.
> Q: There is polluted water coming out the other side.
> A: Yes, sir.
> Q: Would there be a way to divert the water coming out the other side?
> A: To?
> Q: I guess, has there ever been a proposal to pipe the water to other property that you own?
> A: I believe so, yes.
> Q: And did [StarLink] not propose paying for that pipe so that the water could be diverted to other land that you own?
> A: I've heard that, yes.
> Q: And so that proposal was rejected, because you don't want that polluted water any more than [StarLink] does, do you?
> A: I personally didn't reject it, no.
> Q: So who rejected it?
> A: I don't recall.
> Q: So no cost solution that would have moved the polluted water away from Arrow Lake to your property was rejected?
> A: I don't recall.

13

When subsequently questioned by TDEC, Mr. Grosko testified that no net environmental benefit would result from piping discharge away from Arrow Lake to another location. Upon inquiries by two Board members, Mr. Grosko reiterated that he could not recall the details of StarLink's piping proposal and that the landfill waste would still have to be addressed. StarLink's counsel mentioned the proposal during closing arguments and suggested that ACC construct a seepage-proof retention pond and divert discharging water to that location in addition to treating the water. This, however, was merely argument and not evidence on which the Board could base its decision. *See Oakes v. Oakes*, 235 S.W.3d 152, 158 (Tenn. Ct. App. 2007) (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)) (explaining that arguments and statements by counsel during a hearing are not evidence).

ACC presented proof that it could not afford to remove the waste material and also divert or treat the water flowing out of the landfill. Mr. Apple, the former director of the Division of Solid Waste Management, explained that the proposed Amended Order did not address the issue regarding water flowing out of the landfill because the flow, direction, and depth of the groundwater were not known. Mr. Garden testified that contaminated discharge leaves ACC's property at multiple points, and there was no single point of contact between the landfill waste and groundwater. He discounted the feasibility and effectiveness of treating the water leaving the landfill. Ms. Sullivan testified that the proposed plan focused on capturing the water entering the landfill because it would be more cost-effective than capturing the water leaving the landfill.

The record reflects that the Board gave fair consideration to the diversion option. Two Board members made inquiries in response to StarLink's counsel's cross-examination questions regarding StarLink's purported proposal to pay for piping. During deliberations, Board members commented that piping off surface water would not address groundwater discharge, that capturing and piping water would be complex given subsurface geological conditions, and that negotiating a piping proposal would add further unnecessary delay to addressing the problem. Board member Smith suggested that the ideal solution would be to perform actions in the proposed Amended Order and divert discharge elsewhere through pipes at StarLink's expense. After discussion, the Board voted to approve the proposed Amended Order. The Board decided it was necessary to address the root cause of the problem, avoid unnecessary delay, and that the geological conditions would make any piping proposal difficult to implement or, at best, only partially effective. The Board also noted that it would be in no one's interest to bankrupt ACC by requiring it to divert and treat the water. The Board did not spend a great deal of time discussing the diversion option primarily because StarLink failed to present any evidence that the piping alternative was feasible or would be effective. During oral argument before this Court, counsel for StarLink acknowledged that StarLink was not advocating for the piping diversion remedy. Clearly, the Board considered the evidence and made a reasonable decision.

14

The Court of Appeals, in rejecting the Board's decision and remanding the case to the Board to explore more options, misapplied the arbitrary or capricious standard and instead substituted its judgment for that of the Board. The Court of Appeals determined that the Board's decision "failed to give any significant consideration to an option that would divert the flow of pollutants from discharge into waters of the [S]tate." *Starlink Logistics Inc.*, 2015 WL 1186311, at *6. This, according to the Court of Appeals, rendered the Board's decision arbitrary, capricious, and "a clear error in judgment." *Id.* at *10. The primary "option" the intermediate appellate court determined the Board should have more carefully considered was the diversion of water before it entered Sugar Creek by piping the water elsewhere. The evidence relied on by the Court of Appeals was a reference by StarLink's counsel to a piping proposal while cross-examining ACC's representative, Mr. Grosko, wherein Mr. Grosko acknowledged hearing about a proposal by StarLink to pay for the piping. From the brief exchange, the Court of Appeals concluded:

> Assuming StarLink is still willing to pay for the pipe(s) necessary to divert the water, it would be unreasonable to not implement the diversion plan, under which leachate would be contained on ACC's property rather than continually polluting the waters of the [S]tate. ACC has sufficient remaining acreage outside of the landfill that could host a retention pond or other storage for the leachate, and this should not be ignored at the expense of continued pollution to waters of the [S]tate.

*Id.* at *9.

Calling the piping option a "feasible and potentially economically viable complement to the plan," the Court of Appeals remanded the case back to the Board to hear proof on StarLink's willingness to pay for the pipe, the estimated costs of implementing the plan, and ACC's economic ability to implement the piping plan. *Id.* at *10. Respectfully, this search for a solution was not within the province of the Court of Appeals. The Board did not ignore the testimony regarding the piping option, but considered and rejected it as a viable solution.

### III. Conclusion

The Court of Appeals failed to properly apply the judicial review provisions of Tennessee Code Annotated section 4-5-322(h) and substituted its judgment for that of the Board. We reverse the decision of the Court of Appeals and remand this case to the Court of Appeals for consideration of the issues it pretermitted.[5] Costs of this appeal are

---

[5] Amici Curiae argue before this Court that the Board's approval of the Amended Order was arbitrary and capricious because the Amended Order does not require ACC to obtain a National Pollutant Discharge Elimination System ("NPDES") permit. Amici contend that an NPDES permit requirement would ensure opportunity for the public to comment and participate in the development of plans to address the discharge of pollutants into Arrow Lake. Because we remand this matter to the Court of Appeals for review of pretermitted issues, we do not reach the issue raised by the Amici.

taxed to StarLink Logistics Inc. and its surety, for which execution shall issue if necessary.

_____

SHARON G. LEE, CHIEF JUSTICE