IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 2, 2024

## LESLIE BURKE v. STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES

**Appeal from the Chancery Court for Greene County**
**No. 22CV126      Douglas T. Jenkins, Chancellor**

_____

**No. E2023-00902-COA-R3-CV**

_____

This appeal arises from a judgment upholding a decision by the Administrative Procedures Division of the Tennessee Department of Children's Services denying the appellant an award of reasonable expenses after a contested case hearing pursuant to Tennessee Code Annotated section 4-5-301, *et. seq.* Upon the appellant seeking judicial review, the trial court affirmed the decision by the Department. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

Agnes Trujillo, Strawberry Plains, Tennessee, for the appellant, Leslie Burke.

Jonathan Skrmetti, Attorney General and Reporter, Katherine P. Adams, Assistant Attorney General, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## I. BACKGROUND

According to the record, K.M. ("Child") was placed with Jennifer and Charles McKnight in New Mexico shortly after her birth to a drug addicted mother; she was adopted by that family at the age of thirteen months in 2011.[1] The McKnights placed the

_____

[1] K.M.'s biological mother is also possibly bipolar.

Child for adoption in 2017 after she "began exhibiting sexualized behaviors." Custody of the Child was transferred to Heather and Donovan Gingerich ("Legal Parents") in Indiana. This adoption was also unsuccessful due to the Child's behaviors. Records from both New Mexico and Indiana reflect K.M.'s history of masturbation and attention-seeking conduct. Medical reports reflect hospitalizations in both states due to the Child's psychiatric issues. A review of a SubAcute Psychiatric Evaluation of the Child when she initially entered foster care in Tennessee reveals that K.M. was diagnosed with Oppositional Defiant Disorder, Reactive Attachment Disorder ("RAD"), and Post-Traumatic Stress Disorder. The expert at the contested case hearing noted that the Child had additionally been diagnosed with Attention Deficit Hyperactivity Disorder, Conduct Disorder, Auditory and Visual Hallucinations, Suicidality, anxiety, and depression. He opined that she probably suffers from a neurodevelopmental disorder. The records indicate that she has "trouble listening" and "being honest."

A Tennessee couple, Leslie and Melissa Burke ("Burkes"), filed a Petition for Custody Pending Adoption contemporaneous with their Petition for Adoption of the Child from the Gingerichs in the Superior Court for Hamilton County, Indiana ("Indiana Court"). The Burkes planned to bring the Child into Tennessee for the purpose of adoption and sought approval from the Tennessee Department of Children's Services ("DCS") for the placement pursuant to the Interstate Compact for the Placement of Children ("ICPC").[2] The Child's Legal Parents had executed consents to the adoption on August 28, 2018. The Burkes were permitted by DCS to bring the Child to Tennessee on September 25, 2018. By order filed September 28, 2018, the Indiana Court granted temporary legal custody of the Child pending adoption to the Burkes.

On July 11, 2019, DCS received a referral alleging psychological harm of K.M. by the Burkes. The referral also reported that K.M. was potentially the victim of human trafficking. DCS filed a Petition for Order Controlling Conduct and for Protective Supervision. The petition provided that the Child had disclosed to her Tennessee therapist engaged by the Burkes after her placement with them that she had been sexually abused by the fathers in both of her prior families (McKnight and Gingerich). She also claimed abusive actions by the Gingerich mother.[3] The petition, which mentioned the multiple mental health diagnoses of the Child, did not allege sexual abuse or physical abuse occurring in the Burke home, but it requested that the Burkes be ordered to permit K.M. to engage in individual therapy with the current therapist and a walk through of their home.[4] The Burkes did not agree with the plan set forth in the petition. On August 8, 2019, the Greene County, Tennessee Juvenile Court ("Juvenile Court") ordered the Child into foster

---

[2] The ICPC controls the placement of children across state lines. *See* Tenn. Code Ann. § 37-4-201, *et seq.*; *see also In re Isaiah R.*, 480 S.W.3d 535, 538 (Tenn. Ct. App. 2015).

[3] The Indiana Department of Child Services investigated the allegations of abuse by the Legal Parents and found them to be unsubstantiated.

[4] The petition contended that the Burkes had admitted to "purchasing" the Child from the Indiana family.

care by *ex parte* order.

Crystal Gibson, the initial DCS investigator, was aware the Burkes' had legal custody of K.M. but claimed she was unaware that an ICPC home study had been completed.[5] Ms. Gibson spoke to K.M.'s therapist and a child welfare worker in Indiana.[6] Apparently, it was inferred to Ms. Gibson by the therapist that the Burkes "bought" the Child and that no ICPC had been completed. Ms. Gibson testified that "[t]here were just concerns about what may be going on in that home." She related that "upper management had questions." Another foster child in 2018 had alleged rape by Mr. Burke; the record reflects that she recanted the allegations. Further investigation of that claim resulted in no prosecution and a declaration that "[e]verything was fine." Ms. Gibson did not speak to the Burkes; she drove by their home, but because a gate existed at the end of the driveway, she filed the petition without speaking to them. Ms. Gibson conceded that during her investigation, she ultimately determined that the therapist had been "somewhat untruthful" with DCS. ("I did through my investigation find that the things that were said to me were not true."). Ms. Gibson testified: "I maybe should have done a few more things outside of [therapist]. I should have [gone] some other avenues too and not just there." Some things, she noted, could not be proven or disproven. Her goal, she claimed, was to get the Child the necessary treatment as sought by the therapist. K.M. has remained in foster care since August 8, 2019.

The Federal Bureau of Investigation ("FBI") also conducted an inquiry due to the allegations of human trafficking. DCS's records indicate that the FBI agent informed the Gingerichs "that there is suspicion that the Burkes do not have the best reputation with Tennessee CPS" and "that they have been unwilling to cooperate … in the court proceedings in Tennessee." During a forensic interview on October 10, 2019, the Child denied any abuse or neglect by the Burkes and stated, "I have good parents." She identified the Burke home as "safe" but alleged abuse in her other homes. Ultimately, no evidence was found that the Child was trafficked. Nevertheless, on October 10, 2019, DCS accepted the surrender of parental rights from the Legal Parents and filed a motion for full guardianship in the Juvenile Court. The Burkes subsequently filed an action challenging the surrender by the Legal Parents and the full guardianship order.

According to the Burkes, upon the Greene County DCS office becoming aware of

---

[5] DCS had fully investigated the placement pursuant to ICPC.

[6] Per DCS records, the Gingerichs were advised by a psychologist that the Child "should be institutionalized" because of her behavior. Mr. Gingerich stated that they contacted a Christian organization that assisted in adoptions of special needs and hard-to-place children. They were connected with the Burkes who had previously adopted two RAD children. The Legal Parents conducted three to four phone interviews with the Burkes, spoke to their references, and read the home study on them prepared by a social worker. The family denied that the Burkes bought the Child from them—they admitted that they were desperate to place her because they were ill-prepared to address her needs. The Gingerichs advised "that they did everything they could to check out this family and they thought they did the right thing …."

the lawsuit seeking the Child's return, monthly case summaries began reflecting negatively on the Burke family. A caseworker testified at the hearing to entering the following case summary:

> The removal home is the Burke family. The Department non-suited the family. The family would not work with the Department. The family's attorney is being difficult to work with. F.S.W. is very careful on e-mail wording as this attorney has sued the Department twice. The attorney has appealed this case to the Circuit Court. If this does not work the attorney will take it to the appella[te] court.

The Burkes assert that upon the Child's foster mother becoming aware of the litigation filed by the Burkes, she began a false narrative about K.M. having a genital injury. On September 4, 2020, DCS received a referral alleging sexual abuse of the Child, then ten years old, by Mr. Burke. The DCS investigator, Allison Jenkins Hicks, reported the following after a visit to the foster home to visit K.M.:

> [Foster Mom] said that [K.M.] and the child in the home had gotten into an argument after sharing previous trauma history. [Foster Mom] said she asked [K.M.] where the anger was coming from as she had been so angry recently …. [Foster Mom] … said that [K.M.] said Leslie and [K.M.] rode out into the woods and when in the woods, he stuck his private part in her private part …. [Foster Mom] said that the other child in her home praised [K.M.] for telling her story.

At a forensic interview, Ms. Hicks noted that K.M. divulged that Mr. Burke "did things he wasn't supposed to do to me"; that while they were in the woods away from everyone, Mr. Burke "put his private in her private"; and that when she sat on the couch with Mr. Burke, he would "move his private parts …."[7] The Child reported that Mrs. Gingerich took a video of her without any clothes on, taking a shower, and that was probably how the Burkes found her, because Mrs. Gingerich "sold" her.

The record reveals that the foster mother asked for constant updates on the litigation and engaged in discussions with the caseworker and other representatives; in one recorded incident, she inquired if the allegations in the report of sexual abuse were "enough … to make a case against the family in Greeneville" and the representative answered that she believed so.

---

[7] Mr. Burke asserts that it is significant the foster sibling living in the home with K.M. at the time of the allegation had apparently been a victim of sex abuse multiple times. She came into the home just weeks before K.M. made her claim against Mr. Burke after a year had passed since K.M.'s removal from the Burke home.

On November 19, 2020, DCS substantiated a finding of sexual abuse by Mr. Burke. In July 2021, DCS gave notice to Mr. Burke that he had been substantiated for child sexual abuse in regard to the Child based upon two of eight listed validation criteria. *See* Tenn. Comp. R. & Regs. 0250-07-09-.06. DCS based the substantiation upon "Forensic medical exam, therapy notes": "Medical and/or psychological information from a licensed physician, medical center, or other treatment professional, that substantiates that … sexual abuse … occurred." DCS further argued that the validation criteria of "Forensic Interview," "[t]he child victim's statement that abuse occurred" was sufficient to substantiate Mr. Burke as a perpetrator. A Child Protective Investigation Team ("CPIT"), through which every referral involving severe abuse or sexual abuse allegations must be presented, decided to substantiate K.M.'s claim against Mr. Burke "due to the child's history of disclosing information that was corroborated." *See* Tenn. Code Ann. § 37-1-607.

Investigator Hicks asserted that corroboration of the Child's sexual abuse claims could be confirmed by K.M. repeating other non-abuse related events (K.M.'s statements about killing chickens and being tied up with zip ties); thus, she presumed the Child was being truthful about the abuse by Mr. Burke. She admitted that the corroborated information had nothing to do with Mr. Burke. Ms. Hicks acknowledged not reviewing K.M.'s therapy records and not speaking with the therapists and DCS colleagues; such review would have revealed that the Child's statements showed inconsistencies. She failed to consider the Child's history for making sexual abuse allegations against caregivers.[8] Ms. Hicks did not consider K.M.'s lengthy history of inappropriate sexual behavior and self-stimulation.[9] Interestingly, Ms. Hicks did not engage with the Burkes or their 15-year-old daughter.[10] Nor did she consider the influence of the foster mother and the foster sibling on K.M. Mr. Burke maintains that DCS only considered evidence to confirm the allegation of abuse and discounted any evidence to the contrary

After Mr. Burke requested review, the contested case hearing occurred on November 22-23, 2021. The expert who testified at the hearing observed: "[N]ormal rules of assessing a child's statements of abuse do not apply to this child. All her mental health and psychological records are vital, and a provider would need to review every ounce of her records." He opined "that using K.M.'s forensic interview alone to substantiate Mr. Burke is dangerous because K.M. is subject to suggestibility and the circumstances surrounding her forensic interview are questionable." He did not believe that her

---

[8] The Gingerichs told the FBI and Indiana investigators that the Child had filed false allegations against them previously. They explained that her behaviors were "tearing the family apart" and that their children "have nightmares about her having to come back" to their home. The expert at the hearing observed that K.M. reported sexual abuse in every home in which she had lived.

[9] DCS records in 2019 reflect that K.M. "was penetrating [15-year-old in Burke home] with her fingers" and that she "also masturbates 2-3 times per week …." The Gingerichs reported that K.M. "would masturbate on top of her siblings" and "would gyrate when she sat on [someone's] lap[] or on the basketball [goal] pole." The records reflect that K.M. has put objects in her anus and vagina since she was a toddler.

[10] The inattention to the other child in the Burke home is perplexing.

disclosures were credible, but conceded there is no way to know for certain. On December 14, 2021, in a 28-page order, the administrative law judge ("ALJ") determined that the evidence **did not** meet the requisite standard of a preponderance of the evidence that the alleged abuse occurred. The ALJ found that the foster mom was not a reliable historian given established untruthfulness on her part, and the Child's versions of events were inconsistent.[11] In the ruling, the ALJ noted K.M.'s history of dishonesty and attention-seeking in contrast to the Burkes' testimony that no abuse occurred. DCS was directed to change the classification of the referral to "Not Substantiated."

Mr. Burke thereafter filed a Motion for Costs and Attorney Fees in which he argued in pertinent part that the claims contained in the notice were not warranted by existing law and lacked evidentiary support, and that DCS issued the notice to Mr. Burke to harass, cause unnecessary delay, or cause needless expense. Mr. Burke contends that DCS knew, upon investigation, that the Child's statement was the result of influence and innuendo combined with her own mental health issues. He posits that two of the three claims were blatantly inaccurate—the forensic medical examination did not credit or discredit the allegations of abuse, and the therapy notes from three sources made no disclosures of abuse against Mr. Burke until the report by the foster parent. According to Mr. Burke, DCS disregarded the legal requirement that a preponderance of the evidence must be shown. He contends that the investigation was not thorough and was clearly flawed.

The ALJ ruled that even though DCS "lacked evidentiary support,… no testimony or evidence presented at trial … supports that the substantiation … was made to harass, cause unnecessary delay, or cause needless expense" to Mr. Burke. The ALJ found that the notice was based upon existing law because the Child did make a statement of abuse without regard to the weight or credibility of that statement.

Mr. Burke filed a timely appeal of the decision denying his request for attorney fees and costs. The trial court, on May 19, 2023, affirmed the decision of DCS, finding "no basis to support reversing or modifying" DCS's decision, as there was "no evidence that the administrative decision was arbitrary or capricious, characterized by an abuse of discretion or clearly unwarranted exercise of discretion, or unsupported by evidence that is both substantial and material in light of the entire record." The trial court concluded that DCS applied the correct legal standard insofar as the applicable statute was amended during the pendency of proceedings. Mr. Burke again timely appealed.

---

[11] The foster mother asserted to DCS that the Child's primary care physician informed her that an examination of the Child's genitalia revealed scarring. A stipulation was entered in this matter that the doctor "did not make any statement to the foster mother … that the [C]hild's hymen was scarred or otherwise "in rough shape.'"

## II. ISSUES

The specific issues raised by Mr. Burke are restated as follows:

1. Did DCS misinterpret DCS Policy, Work Aid 3, in determining that existing law only required some evidence of one of the validation criteria listed in that policy?

2. Did DCS fail to apply promulgated rules and/or its own policy that required a preponderance of the evidence to substantiate an individual for child abuse in determining existing law?

3. Did DCS fail to evaluate the evidence of bias and affirmative actions by its agents and employees in creating a report of harm to thwart litigation filed by Mr. Burke to regain custody of the Child in question?

4. Did the trial court fail to conduct a *de novo* review of the applicable law in reviewing the decision of DCS?

## III. STANDARD OF REVIEW

The Uniform Administrative Procedures Act ("UAPA") provides for judicial review of agency decisions. Tenn. Code Ann. § 4-5-322. We review an agency decision under the narrowly defined standard of review found in Tennessee Code Annotated section 4-5-322(h) rather than broader review standards found in other civil appeals. *Clear Channel Outdoors v. Tennessee Dep't of Transp.*, 337 S.W.3d 801, 804 (Tenn. Ct. App. 2010). The court may affirm the decision of the agency or remand for further proceedings, but may only reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are found to be one of the following: 1) in violation of constitutional or statutory provisions; 2) in excess of the statutory authority of the agency; 3) made upon unlawful procedure; 4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or 5) unsupported by evidence that is both substantial and material in light of the entire record. Tenn. Code Ann. § 4-5-322(h).[12]

The agency's interpretation of a state statute or rule is reviewed *de novo.* Tenn. Code. Ann. § 4-5-326 ("In interpreting a state statute or rule, a court presiding over an appeal of a judgment in a contested case shall not defer to a state agency's interpretation of the statute or rule and shall interpret the statute or rule *de novo*"); *see also Sevier Cnty. v. Tenn. State Bd. of Education*, No. E2022-00777-COA-R3-CV, 2023 WL 3298376, at *5 (Tenn. Ct. App. May 8, 2023). Courts do not review questions of fact *de novo*, even if the

---

[12] The statute was amended in 2021.

evidence could support a different result. *StarLink Logistics Inc. v. ACC, LCC*, 494 S.W.3d 659, 669 (Tenn. 2016) (citing *Tenn. Envtl. Council, Inc. v. Tenn. Water Quality Bd.*, 254 S.W.3d 396, 401-02 (Tenn. Ct. App. 2007)).

A decision is arbitrary or capricious if it is not supported by any substantial and material evidence. *StarLink Logistics Inc.*, 494 S.W.3d at 669 (citing *Pittman v. City of Memphis*, 360 S.W.3d 382, 389 (Tenn. Ct. App. 1993)). Substantial and material evidence is "more than a 'scintilla or glimmer' of evidence" but "less than a preponderance of the evidence." *Id.* A decision that is supported by evidence may still be arbitrary or capricious if "not based on any course of reasoning or exercise of judgment, or … [if it] disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (quoting *City of Memphis v. Civil Serv. Comm'n of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007)). When an agency is acting "within its area of expertise and within the exercise of its judgment," a reviewing court will not overturn the agency decision "solely because the court disagrees with the agency's ultimate conclusion." *StarLink Logistics Inc.*, 494 S.W.3d at 670.

"The substantial and material evidence standard requires a searching and careful inquiry into the record to determine the basis for the administrative decision." *Miller v. Tenn. Bd. of Nursing*, 256 S.W.3d 225, 229 (Tenn. Ct. App. 2007). "In these cases, the courts do not reweigh the evidence or substitute their judgment for that of the administrative agency." *Id.* (citing *McClellan v. Bd. of Regents*, 921 S.W.2d 684, 693 (Tenn. 1996)). "Instead, they review the record for such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Id.* (citing *Clay Cnty. Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993)). The court "may not reverse an administrative decision supported by substantial and material evidence solely because the evidence could also support another result." *Id.* (citing *Hughes v. Bd. of Comm'rs*, 319 S.W.2d 481 484 (Tenn. 1958)).

## IV. DISCUSSION

Under the UAPA, there are limited circumstances in which costs and attorney's fees may be granted:

> (a)(1) When a state agency issues a notice to a person, local governmental entity, board, or commission for the violation of a rule or statute and the notice results in a contested case hearing, at the conclusion of the contested case hearing, the hearing officer or administrative judge may order the state agency to pay to the respondent the reasonable expenses incurred because of the notice, including a reasonable attorney's fee, if the hearing officer or administrative judge determines that:

(A)(i) The claims contained in the notice are not warranted by existing law nor by a nonfrivolous argument for the extension or modification of existing law; and

(ii) The claims contained in the notice do not have evidentiary support; or

(B) The state agency issued the notice to harass, cause unnecessary delay, or cause needless expense to the party issued the notice.

Tenn. Code Ann. § 4-5-325(a)(1).[13] This standard "is *not* satisfied simply by a state agency failing to prevail against the respondent." Tenn. Code Ann. § 4-5-325(a)(2) (emphasis added). But Section 4-5-325(a) does not require a showing of intentional conduct such as harassment or bad faith by an agency in order for attorney fees to be awarded. *American Child Care, Inc. v. State of Tenn., Dept. of Human Servs.*, 83 S.W.3d 148, 152 (Tenn. Ct. App. 2001). In that case, the court found that "a proceeding brought with the utmost good faith may result in an award of attorney's fees to the cited party if the citation was not well grounded in fact and not warranted by existing law." *Id. See also Fitzpatrick v. State of Tenn., Dept. of Human Servs.*, No. M2013-00823-COA-R3-CV, 2014 WL 1092368, at *27 (Tenn. Ct. App. Mar. 28, 2014).

According to DCS, the substantiation of Mr. Burke was well grounded in fact based upon the evidence available to the agency at the time as well as existing law. *See* Tenn. Code Ann. § 37-1-406. DCS further asserts that the claims were not frivolous nor were they intended to "harass, cause unnecessary delay, or cause needless expense." The Child made clear statements in a forensic interview that she had been sexually abused by Mr. Burke. DCS argues that, as statutorily required, it investigated the statements in the forensic interview to the best of its ability because Mr. Burke, by and through counsel, declined to be interviewed or to offer any explanation for the claims by the Child. The DCS record in this matter reflects that the Greene County Sheriff's Office "attempted to contact [Mr.] Burke for an alleged perpetrator interview …." Through his attorney, Mr. Burke advised that he would not participate. DCS denies that it knowingly made false allegations in this case and contends that it believed it could meet the preponderance of the evidence standard. As the issues raised in this appeal reflect, Mr. Burke claims that DCS did not fulfill the

---

[13] This statute has been modified since the initial substantiation in 2020. *See* Tenn. Code Ann. § 4-5-325 (eff. July 1, 2022). Though the statute was changed substantively in 2021 while the administrative proceeding was ongoing, Mr. Burke filed his motion for costs and attorney's fees *after* the 2021 amendment to the statute and relied on the 2021 version in his motion. *C.f. Brown v. Tenn. Dep't of Safety & Homeland Sec.*, No. M2021-00422-COA-R3-CV, 2022 WL 1511748, at *6 n.1 (Tenn. Ct. App. May 13, 2022) (applying the pre-2021 version of the statute where the agency notice was sent in 2015 and the ALJ awarded fees under the statute in 2017). While the statute was amended again in 2022, the changes were not substantive and do not affect the arguments in this appeal. Therefore, the current version of the statute is cited.

requirements of its investigative policies, which he argues make the substantiation unreasonable. He acknowledges that there is no evidence that he was intentionally classified as a perpetrator of abuse. He contends, however, that DCS, as an agency, took action to prevent a return of the Child to the Burkes.

Existing law warranted DCS's notice of substantiation of Mr. Burke for child abuse as it was based on the Child's disclosures, even though the evidence ultimately was found insufficient to meet the required burden of proof. The Child made detailed disclosures of sexual abuse in a forensic interview. She answered numerous clarifying questions by the interviewer and drew a picture of where she and Mr. Burke were located on the four-wheeler when the alleged abuse occurred. She also pointed to a drawing to show which body parts she was discussing. Based on DCS records and reports from Indiana, Investigator Hicks corroborated the Child's statements in the interview with others she made about killing chickens and being tied up with zip ties. While the medical examiner did not find any physical evidence of assault on the Child, the examiner commented that the Child's refusal to speak and anxious demeanor should be considered in determining whether inappropriate sexual conduct occurred.

"A report made against an alleged perpetrator shall be classified as substantiated if the preponderance of the evidence, in light of the entire record, proves that the individual committed any form of abuse or neglect." Tenn. Comp. R. & Regs. 0250-07-09-.06. In doing so, "the reviewer may consider, but is not limited to" eight factors, one of which includes "[t]he child victim's statement that the abuse occurred." *Id.*

As noted by the ALJ, in order for her to allow a fee award,

> [T]here must be a finding that the claims contained in the notice sent by [DCS] were not warranted by existing law <u>and</u> lacked evidentiary support. While the appeal summary did list support for the substantiation that was incorrect, specifically 'forensic medical exam' and 'therapy notes,' the summary also listed the alleged child's victim's statement that abuse OCCURRED, which was factually correct. K.M. did in fact report sexual abuse by [Mr. Burke]. [DCS]'s policy allows for substantiation of an alleged perpetrator based on <u>at</u> <u>least</u>[14] one validation criteria, which includes a child's statement that abuse occurred …. For these reasons, this Administrative Judge cannot find that the claims in the notice were not warranted by existing law ***even though they were eventually found to be lacking evidentiary support at trial***.

(Emphasis added) (internal citations omitted).

---

[14] Emphasis in original.

Despite our concern regarding "less-than-stellar" investigation practices in this matter, we concur in the finding that there is not a preponderance of the evidence to suggest that DCS acted with a purpose to harm Mr. Burke. Further, we are not convinced that DCS's actions were to harass, cause unnecessary delay, or cause needless expense to Mr. Burke. The evidence supports the finding that DCS acted upon the belief that its determination was justified to protect the Child.

## V. CONCLUSION

The order denying Mr. Burke's requests for costs and attorney fees is affirmed. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are assessed to the appellant, Leslie Burke.

_____
JOHN W. MCCLARTY, JUDGE