FILED
07/29/2019
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### June 4, 2019 Session

## THE PARKING GUYS, INC. v. METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE EX REL TRAFFIC & PARKING COMMISSION

**Appeal from the Chancery Court for Davidson County**
**No. 17-970-II     William E. Young, Chancellor**

---

### No. M2018-01409-COA-R3-CV

---

This appeal concerns the denial of a valet parking permit. The Parking Guys, Inc. ("Parking Guys") sought a permit for valet parking from the Traffic and Parking Commission ("the Commission") of the Metropolitan Government of Nashville and Davidson County ("Metro"). Despite a study reflecting no traffic problems caused by Parking Guys' activities, the Commission denied the permit. Parking Guys then filed a petition for common-law writ of certiorari in the Chancery Court for Davidson County ("the Trial Court"). The Trial Court found that, notwithstanding the study, the Commission's decision was supported by material evidence including the firsthand observations of local business owners. The Trial Court also denied a petition to intervene filed by Linda Schipani ("Schipani"), an individual sued by Parking Guys in federal court for allegedly conspiring to deny the permit. Parking Guys appeals to this Court, as does Schipani still seeking to intervene. Parking Guys argues that the Commission's decision was based on politics rather than material evidence. Schipani, for her part, argues she has a special interest in this case warranting her intervention because of the federal suit filed against her even though it has been dismissed. We hold that the Commission's decision was supported by material evidence. We further find no reversible error in the Trial Court's decision to deny Schipani's motion to intervene. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Bob Lynch, Jr., Nashville, Tennessee, and Matthew J. Hoffer, Lansing, Michigan (appearing *pro hac vice*), for the appellant, The Parking Guys, Inc.

Jon Cooper, Director of Law, the Department of Law of the Metropolitan Government of Nashville and Davidson County; Lora Barkenbus Fox, Catherine J. Pham, Metropolitan attorneys, for the appellee, the Metropolitan Government of Nashville & Davidson County, Tennessee, by and through its Traffic and Parking Commission.

Daniel A. Horwitz, Nashville, Tennessee, for the appellee/intervening-defendant, Linda Schipani.

## OPINION

## Background

Parking Guys is a company that provides valet parking services. This litigation stems from Parking Guys' application to obtain a permit to perform valet parking service for patrons of Déjà Vu, an adult club located in Nashville. Valet service is conducted on 15th Avenue North, although the club's address is 1418 Church Street. Parking Guys is licensed to conduct valet parking operations but needed to obtain a permit to legally conduct operations at this specific location. Metro Code § 12.41.030, "Valet location permit required," provides:

> In addition to the licensing requirements of Section 12.41.020 of this chapter, the department shall issue parking permits to valet parking operators to conduct their operations on public streets as a commercial enterprise or in furtherance of a commercial enterprise. A separate permit is required for each location where valet parking services are provided. Permits will be issued only for locations where valet parking would not be detrimental to the public safety, health and welfare of the inhabitants of Nashville and Davidson County and only after approval of the commission.

In May 2017, Parking Guys applied to Metro's Public Works Department for a valet parking permit. The application was denied. Parking Guys was, however, able to obtain temporary lane closure permits pending appeal. A hearing was held before the Commission on July 10, 2017. Parking Guys owner Craig Martin gave his input, as did several neighboring business owners. Parking Guys' application for a valet permit faced strong opposition from locals who asserted that Parking Guys' activities obstructed traffic, caused problems with parking, and created a hazard to pedestrians. One such opposing perspective came from Schipani, President of Clinical Research Associates located across the street from Déjà Vu, who stated:

> MS. LINDA SCHIPANI: The white building is ours. And the parking lot behind there is ours. I will tell you that we have "No

Trespassing" and -- signs, and "No Parking." But despite that we have had -- we've had parking there.

Particularly we've had parking from -- the valet parkers themselves are parking there. We have had -- there's traffic up and down the street. They are parking between my -- my exit, or entrance, right there from the alley to -- to my parking lot. And you can hardly get out of there. It's constantly there.

On the other side they're parking between our -- our parking lot so that you can't get out of our parking lot safely without going into the other lane of traffic. I will assure you that with -- with what we're seeing, there's so much traffic down there, there's traffic up and down the street. And the police have been called multiple times.

The Commission did not reach a decision at this hearing. Instead, it deferred ruling on the permit so that Public Works could conduct a study on the traffic effects of Parking Guys' activities. A group called Collier Engineering carried out the study, which was the basis for a written report. The Collier Report stated, in part:

As shown in the table, approximately 49 valet maneuvers were counted on Friday, July 28th evening and Saturday July 29th early morning, which results in approximately 25 valeted vehicles, and was the busiest day observed. It should be noted that rideshare, taxi, and pedicab drop-off and pick-up activities were also observed occurring along the 15th Avenue North block frontage. The observations also showed that there were five (5) vehicles that experienced delay on 15th Avenue North due to congestion at the valet stand and curb face. One instance was observed during the 9:00 PM hour on Friday evening, one instance during the 1:00 AM hour of Saturday morning, and three vehicles were affected during the 2:00 AM hour on Saturday morning. When this occurred, the street operated with slow "Yield-Flow" conditions.

During the observations, northbound traffic on 15th Avenue North backed up into the crosswalk at its intersection with Church Street on two occasions both during the 2:00 AM hour. One instance lasted approximately 10 seconds and the second lasted approximately 30 seconds. Both involved one vehicle turning onto 15th Avenue North from Church Street and did not extend beyond the crosswalk. The busiest time period for the valet stand and rideshare/occurred around closing time (3:00 AM) on Friday evening/Saturday morning when through traffic on 15th Avenue North and Church Street is fairly low. Parking and standing was observed on the west side of 15th Avenue North within 20-30 feet of the stop line for

southbound 15th Avenue North traffic at Church Street during portions of the observations. A couple of vehicles were observed making U-turns from the valet stand to go south on 15th Avenue North and access the traffic signal; however, it is not clear from the data whether those were made by valet staff or the customers/vehicle owners. The traffic signal goes into Flash Mode at 3:00 AM.

It should be noted that the observations were conducted over one weekend, and it is not known how it compares to typical operations and number of customers.

At this juncture, we deem it helpful to provide the reader some visual context. The following photograph contained in the administrative record, although not illustrative of Parking Guys' alleged dangerous activities, shows the site in question:



On August 14, 2017, the Commission took up the matter of Parking Guys' application for a valet parking permit once more. Local business owners again registered their objections. For instance, Eric Steer stated as follows:

> MR. ERIC STEER: So I'm Eric Steer. I'm the plant manager of Country Delite, which is on Church Street across from the establishment. We use the streets, you'll see in the pictures attached.
> I would like to start by saying one clarification. We are a 24/7 operation. So I know the study was done and -- and they did say that the businesses were closing. We are a very old, very well established Nashville pure milk company, Sealtest, Truly Pure (Unintelligible) and now Country Delite.
> CHAIRPERSON GREEN: Okay.
> MR. ERIC STEER: So we are a long-term business. As you can see, it impacts us both because we have 86 to 100 employees. So we have employees that are trying to walk to a parking lot. And we also have tractor trailer traffic that is trying to move. So this is both a safety and an operational thing because we have both people that are trying to walk to their parking, and we have tractor trailers that are going on during this.
> There has been a numerous operational -- our trucks are actually wanting to circumvent this neighborhood. And being dairy operations we load our trucks early in the morning so we can get out to our establishments before significant traffic.
> So I think the pictures speak for themselves. I left letters also. Many, many, many of the business owners -- or all the business owners that are here are having side effects both from their employees, from their people that are coming from both a safety and a business perspective. And I think as you look through the pictures you can see.
> I would challenge the -- the number of events that occurred, because you can see more than those events in the pictures that we listed. And also please note the number of emergency vehicles that travel Church Street going to the number of hospitals that are down there. And you can see from many of the pictures that they back up across Church Street.

Craig Martin, owner of Parking Guys, presented his views as well. Martin, arguing in favor of the permit, stated:

> MR. CRAIG MARTIN: Craig Martin. I'm the owner of The Parking Guys. We have the operation there. In all fairness, I appreciate all the pictures that have been distributed and the opposition. But we're -- we're totally running our operation as we're supposed to. I've spoken with

Sergeant McCluskey on several occasions. He said there's been no problems.

As the study has seen, we don't even park -- you know, enough cars to create any traffic. We're -- we're following all the rules that we're supposed to.

This group of individuals -- and I want to just put it on the table that they are opposed to it for special interest, for creating more business for them. We're doing what we're supposed to. You know, I employ 35 individuals, so removing that situation from us hurts my employees. I mean, we're -- we're doing the best we can do to -- to make the situation work for what it is.

The main bit of traffic that's there that really creates traffic is the cabs and the Ubers and Lyfts. If that "no park" -- where all the cars are parking at on the street, if that could be dedicated for just cabs and -- and -- and Lyfts and Ubers, that would kind of contain some of the traffic issues.

But as I explained to Mr. Lee -- because he's the only one I've had a conversation with -- I've asked him on several occasions to disclose any information that my operation is not going as it's supposed to. I've been there -- since this is the last hearing, I've been there every evening, especially on the weekends. And we're doing exactly -- especially what we're supposed to do.

I explained to him that 90 percent of the traffic that comes in the area comes from (Unintelligible). The (Unintelligible) people that come is not affecting that area. I mean, it doesn't really equate to what's already going on on Church Street.

We can't control because trucks are coming over there. We're just running our operation. You know, so I -- I beg with the -- with the commission to -- to allow us to continue our operation.

CHAIRPERSON GREEN: Okay.

MR. CRAIG MARTIN: We're doing everything we're supposed to.

Freddie O'Connell, Metro councilman for the area, sent an email opposing the permit. O'Connell stated in his email:

I'm writing in support of the position of the Midtown Church Street Business and Residential Association that The Parking Company, Inc. should be denied a valet permit for 15th Ave N.

Having begun operation before the availability of a permit should be consequential enough, but the traffic and parking impact of their client at the corner of 15th Ave N and Church St is sufficiently significant that I

would recommend denial even without evidence of prior inappropriate behavior.

Area property owners have demonstrated to me an extraordinary amount of inappropriate vehicular activity at the intersection in question (not to mention other inappropriate behaviors), and I believe a valet here would present unfortunate public safety concerns, traffic and parking issues that could affect performance of emergency vehicles, and general negative traffic and parking issues for area users of the public right of way.

I believe the business owner needs to find a traffic and parking solution for this corner that does not involve valet.

Please share my opposition to this valet permit with commissioners.

Many thanks, and my best.

The proceedings ended with Commissioner Kern making a motion to deny the valet permit, which was seconded. The following was stated:

> COMMISSIONER KERN: Well, I think the report and the pictures seem to be a little bit at odds from -- just based on -- on -- kind of that -- but I do think the letter from Councilman O'Connell should stand for a lot since he hopefully has a -- the -- a good feeling of what's going on on his street. So I would move to deny the valet stand.
> CHAIRPERSON GREEN: Okay. We have a motion to deny the valet stand. Is there a second?
> COUNCILMEMBER HAGAR: Second.
> CHAIRPERSON GREEN: We have a second.
> All in favor -- any discussion, further discussion of the motion?
> If not, we'll call for a vote. Please raise your right hand if you're for the motion. All in favor of the motion?
> Okay. Any opposed?
> Okay. The valet stand has been denied.
> Thank you, commissioners.

In September 2017, Parking Guys filed a petition for statutory, or alternatively, common-law writ of certiorari in the Trial Court seeking review of the Commission's decision. The case proceeded under the common-law writ of certiorari. Parking Guys, in a later filing, requested "the opportunity to seek leave to conduct discovery on possible undue influence upon the Commission." The Trial Court denied this request.

While the present case was unfolding, on June 1, 2018, Parking Guys sued Schipani and others in federal court alleging civil conspiracy to deny the valet parking permit. On June 25, 2018, after the June 20 hearing on Parking Guys' petition in the Trial Court, Schipani filed a motion to intervene in this matter to defend her interest in the parallel federal litigation. In her motion, Schipani argued her basis for intervention:

> Mrs. Schipani's "interest relating to the property or transaction which is the subject of the action" is similarly beyond dispute. *See* Tenn. R. Civ. P. 24.01(2). Mrs. Schipani is a business owner who owns and operates a property adjacent to the establishment that is the subject of the instant dispute. In that capacity, Mrs. Schipani is and has been substantially affected by the Petitioner's business practices, and the Administrative Record in this case overwhelmingly demonstrates her significant, personal interest in its outcome. *See, e.g.*, A.R. at pp. 19, 20, 21, 22, 23. 96, 97.
>
> The effect that this proceeding will carry in a parallel federal lawsuit that the Petitioner has filed against Mrs. Schipani is equally indisputable. *See Jackson*, 387 S.W.3d at 491. Indeed, during the Parties' June 20, 2018 oral argument, the Petitioner forthrightly acknowledged that the outcome of this case would bear upon its parallel federal claims. Thus, this proceeding will affect the viability of Mrs. Schipani's forthcoming defense in Middle District Case 3:18-cv-00511 as well.
>
> Further, although Mrs. Schipani's interests overlap in part with those represented by the Respondent—who does not oppose Mrs. Schipani's intervention—they are nonetheless imperfectly aligned. In parallel litigation, the Respondent is likely to be able to assert certain defenses and claims to immunity that Mrs. Schipani may not. Further, particularly with respect to Mrs. Schipani's personal interest in avoiding expensive and unnecessary discovery, the Respondent's interests are markedly different from Mrs. Schipani's. Accordingly, Mrs. Schipani's interest in ensuring that her separate defenses in Middle District Case 3:18-cv-00511 are protected through this litigation and her additional interest in securing affirmance of this Court's March 27, 2018 Order Denying [Petitioner's] Motion to Conduct Discovery and/or Complete the Administrative Record can only be adequately represented by Mrs. Schipani herself through her own advocacy.

On July 6, 2018, the Trial Court entered an order upholding the Commission's decision to deny the permit. The Trial Court stated, in part:

In seeking this writ, the Petitioner asserts that the Commission's decision was arbitrary and/or not supported by material evidence. This Court, like the Petitioner, is puzzled that the Commission would adjourn its first hearing to obtain the input of the independent consultant Collier Engineering and then, upon obtaining that report, would disregard or not follow up on that consultant's findings that essentially the Petitioner's temporary operation of the valet permit did not cause significant traffic issues during the time period the consultant observed the Petitioner's business operation. Of course, as Metro correctly observes, the Collier report acknowledged that Collier's observations occurred over a single weekend, and Collier lacked knowledge how this time period would compare "to typical operations and number of customers." Nonetheless, the Commission could have requested Collier to follow up on these initial findings to confirm whether they were correct.

However, as previously stated, it is not this Court's role to reevaluate or reweigh the Commission's decision. This Court may not second-guess the Commission's decision, and should defer to an administrative agency such as the Commission where the Commission is acting within its area of specialized knowledge, experience, and expertise. *See Starlink Logistics, Inc. v. ACC, LLC*, 494 S.W.3d 659, 669 (Tenn. 2016; *Holmes v. City of Memphis Civil Service Commission*, No. W2016-00590-COA-R3-CV, 2017 WL 129113, at *5-9 (Tenn. Ct. App. Jan. 13, 2017).

Upon a careful review of the record, the Court finds the Commission's decision was not arbitrary and that material evidence exists in the administrative record to support the Commission's decision. Six persons with businesses located near the proposed valet permit location unanimously testified that they opposed the granting of this valet permit because it would increase traffic congestion in the neighborhood and could cause safety problems. The area Councilman, as the elected representative for this council district, echoed these neighbors' concerns.

The neighbors' testimony included first hand observations of traffic problems caused by the temporary operation of this valet permit. Mr. Molette talked about the current traffic congestion on Church and 15th streets, near where the valet would be located, and how the valet stand would enhance this congestion and create a "really dangerous situation." Ms. Schipani, an owner of a business directly across the street from the valet stand and a representative of the Midtown Church Street Business & Residential Association, described members of the association witnessing "near miss accidents and traffic congestion which makes safety and emergency access void" since the opening of the valet stand. She identified specific concerns as well, stating that "[w]e have had consistent problems

with valet parking on both sides of the street which impedes the flow of traffic, blocking private parking and presenting safety issues for drivers plus pedestrians." Ms. Buoy, another nearby business owner, stated she had observed "the lanes of traffic have been blocked to the point for the valet and the traffic so that I'm really concerned as far as fire and ambulance" and that during the time the valet was in temporary operation the traffic was "very congested." Mr. Steer, the owner of another neighboring business, stated that "with the start of the Déjà Vu business and the subsequent additional vehicles parked on 15th Avenue, we often find the road blocked for traffic" which caused delays in the shipping and receiving of the "refrigerated milk, juice, drink and other beverages" received and then delivered by Mr. Steer's business operation. He also noted that this increased traffic congestion was particularly a concern given "the number of emergency vehicles that travel Church Street going to the number of hospitals that are down there." Mr. Wilder, another business owner, observed that a parking attendant from Déjà Vu was directing traffic to park in his parking lot without permission.

Finally, Mr. O'Connell, the councilman for the district, summed up the concerns observed by these business owners and other of his constituents by observing that approval of this valet permit would create "unfortunate public safety concerns, traffic and parking issues that could affect performance of emergency vehicles, and general negative traffic and parking issues for area users of the public right of way." The Petitioner asserts before this Court that the Councilman and others who spoke against the permit are actually opposing the permit due to the adult nature of the Déjà Vu business, but the administrative record contains no evidence that this is the case and indeed the record reflects the Petitioner did not raise this concern to the Commission. In any event, the decision to deny this permit was made by the Commission and not by those who spoke against the permit, including Councilman O'Connell.

This evidence is sufficient to establish that the Commission's denial of this valet permit was not arbitrary, and was supported by material evidence in the record. Accordingly, the Petitioner's request for writ of certiorari is denied.

On July 23, 2018, the Trial Court denied Schipani's motion to intervene. The Trial Court stated its reasoning as follows:

In a prior Order, this Court denied the Petitioner's request to pursue discovery in this case. The Court expressly found that allowing wide ranging discovery by the Petitioner was contrary to the general principle

-10-

that a trial court's review of an administrative decision is generally confined to the record underlying that decision. This same analysis mitigates against allowing Ms. Schipani, whose testimony before the Commission is part of the administrative record, to intervene to present further arguments and/or evidence on what is essentially an appeal of the Commission's ruling to this Court. Furthermore, as the Petitioner points out in opposing this motion, the Commission's position is well represented by its counsel. Finally, the Court has already held its hearing on the Petition and entered an Order on July 6, 2018 denying the writ of certiorari. Thus, Ms. Schipani's motion to intervene is not only unnecessary but also untimely. For the above reasons, Ms. Schipani's motion to intervene is denied.

On August 1, 2018, Parking Guys appealed to this Court. On August 6, 2018, Schipani appealed to this Court, as well. In September 2018, the Trial Court re-issued its July 6, 2018 order upholding the Commission's decision, clarifying that it was a final, appealable judgment. This appeal now is properly before us.

## Discussion

Although not stated exactly as such, Parking Guys raises one issue on appeal: whether the Trial Court erred in upholding the Commission's decision to deny a valet permit as being based on material evidence and not arbitrary. Schipani raises her own separate issues that we restate and consolidate as whether the Trial Court erred in denying her motion to intervene.

We first address Schipani's issue regarding her motion to intervene. Schipani asserts that the Trial Court failed to conduct a proper analysis regarding either permissive intervention or intervention as of right, both of which were sought by Schipani. Our Supreme Court has articulated the standard for reviewing a trial court's decision on a motion to intervene:

The standard of review on appeal for the denial of intervention as of right is de novo, except for the timeliness of the application which is reviewed under an abuse of discretion standard. *Michigan State AFL-CIO*, 103 F.3d at 1245. The standard of review for the denial of permissive intervention is abuse of discretion. *Chaille v. Warren*, 635 S.W.2d 700, 703 (Tenn. App. 1982). An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable. *See Ballard*

-11-

*v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996); *State v. Carter*, 890 S.W.2d 449, 454 (Tenn. Crim. App. 1994).

*State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 191 (Tenn. 2000).

Our Supreme Court detailed an intervenor's burden as follows:

> A party seeking to intervene as of right under Rule 24.01 must establish that (1) the application for intervention was timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the pending litigation; (3) the proposed intervenor's ability to protect that interest is impaired; and (4) the parties to the underlying suit cannot adequately represent the intervenor's interests. *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989). The intervenor has the burden of establishing all four of these elements or else the motion to intervene will be denied. *Id*.

*Brown & Williamson Tobacco Corp.*, 18 S.W.3d at 190-91.

Regarding whether intervention is timely, this Court has discussed the applicable factors for consideration:

> The timeliness of an intervention is governed by equitable principles, and is determined by the facts and circumstances of each particular case. In determining whether an intervention is timely, courts consider the following factors:
>
> > (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervener knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervener's failure after he knew or reasonably should have known of his interest in the case to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Velsicol Chemical Corp. v. Enenco, Inc.*, 9 F.3d 524, 531 (6th Cir. 1993); *Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1228 (6th Cir. 1984).

*Am. Materials Techs., LLC v. City of Chattanooga*, 42 S.W.3d 914, 916 (Tenn. Ct. App. 2000).

Schipani states that she tried to intervene in the case as soon as she reasonably could upon learning that Parking Guys was suing her in federal court. Schipani asserts that affirmance of the Trial Court and the Commission's decision would be dispositive in her favor in the federal case, wherein she is accused of conspiring to deny Parking Guys a valet parking permit. Schipani states that, although the federal case has been dismissed, it may yet be appealed. Schipani argues that the original parties to this matter will not be prejudiced by her intervention, and notes that Metro consented to her intervention. For all these reasons, Schipani requests that we reverse the Trial Court's denial of her motion to intervene.

As Schipani observes, the Trial Court did not account explicitly for the factors courts are to consider when ruling on a motion to intervene. However, the Trial Court did explain its reasoning. The Trial Court found Schipani's attempt at intervention both untimely and unnecessary. We agree with the Trial Court. First, Schipani's motion to intervene was filed after the hearing. It is unclear what Schipani can add. Second, the Trial Court denied the additional discovery sought by Parking Guys. Parking Guys subsequently waived the issue of discovery by not raising it as an issue on appeal. Thus, Schipani has no new discovery to contend with. As we will discuss when addressing the next issue, the narrow question before us is whether the Commission's decision was supported by material evidence. Metro, the named Respondent in this case, has filed a brief asserting that it was. That position already has a competent advocate. Respectfully, Schipani's intervention would be superfluous.

Related to this issue, two outstanding motions are before us. Schipani filed a motion to consider as a post-judgment fact under Tenn. R. App. P. 14 the following: "That Petitioner's effective service of its Complaint upon Mrs. Schipani in the Petitioner's parallel federal proceeding occurred on September 19, 2018." In addition, Parking Guys filed a motion to strike Schipani's reply brief on the grounds the reply brief is not limited to the issues permitted by Tenn. R. App. P. 27(c) but rather includes a sur-reply. We grant Schipani's motion and deny Parking Guys' motion, but neither affects our resolution of this issue. We find no abuse of discretion, or any reversible error, in the Trial Court's denial of Schipani's motion to intervene.

We next address whether the Trial Court erred in upholding the Commission's decision to deny a valet parking permit as being based on material evidence and not arbitrary. The parties agree that the common-law writ of certiorari is the proper method of judicial review in this matter. In *Leonard Plating Company v. Metropolitan*

*Government of Nashville and Davidson County*, we discussed the limited and deferential standard applied to decisions reviewed under a common-law writ of certiorari:

> Review under a common-law writ of certiorari does not extend to a redetermination of the facts found by the board or agency whose decision is being reviewed. The courts may not (1) inquire into the intrinsic correctness of the decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the board or agency. However, they may review the record solely to determine whether it contains any material evidence to support the decision because a decision without evidentiary support is an arbitrary one.

> Ascertaining whether the record contains material evidence to support the board's or agency's decision is a question of law. For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence.

*Leonard Plating Co. v. Metropolitan Gov't of Nashville and Davidson County*, 213 S.W.3d 898, 903-04 (Tenn. Ct. App. 2006) (internal citations and footnotes omitted). Regarding that which does not qualify as material evidence, we have stated that "[m]ere beliefs, opinions and fears of neighborhood residents do not constitute material evidence." *411 Partnership v. Knox County*, 372 S.W.3d 582, 589 (Tenn. Ct. App. 2011) (quoting *Sexton v. Anderson County*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979)).

Parking Guys argues that the Commission's decision was based entirely on the "beliefs, opinions and fears" of neighborhood opponents rather than relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. Parking Guys asserts that the Commission could not rely on lay testimony over the expert Collier Report. In response, Metro argues correctly that it is not our place to reweigh the evidence. In order to determine whether the Commission's decision was supported by material evidence, it is useful to review what evidence the Commission had before it.

This matter was heard by the Commission on July 10, 2017 and August 14, 2017. Several local business owners appeared at these hearings and wrote letters opposing issuance of the permit. Their reasons ranged from the proliferation of tow trucks and police activity to improper parking to traffic congestion to risks to pedestrians. Photographs were entered into that record of the site in question. On the other hand, Parking Guys insists that the evidence from opponents is too generalized and never

directly ties its valet operations to these alleged neighborhood problems. Parking Guys points further to the Collier Report as the best evidence on the matter, at least as to alleged traffic problems. Thus, the evidence before the Commission was conflicting. The question before us, however, is not what the best evidence was but rather is there material evidence in the record to support the Commission's decision

We agree with Parking Guys and, case precedent supports, the proposition that mere beliefs, opinions or fears of neighbors are insufficient to qualify as material evidence. However, we disagree with Parking Guys that that was the totality of the evidence presented against it. The firsthand observations of local business owners are not mere beliefs, opinions or fears. They are evidence. While Parking Guys asserts that these opponents are biased and are acting on pretext, it fails to cite to any evidence of the pretext in the record. Certainly, there is no hint that the Commission, which ultimately made the decision, was operating under any pretext.

Nevertheless, Parking Guys touts the Collier Report as its ace, so to speak. We do not believe the Collier Report is as definitive as Parking Guys makes it out to be. First, the report equivocates, stating that "it is not known how it compares to typical operations and number of customers." The Collier Report study took place over the course of a single weekend. No follow-up to the Collier Report was undertaken. In short, this study had serious limitations, and the Commission was not bound to adopt it over all other evidence. Even if the Collier Report definitively disproved any traffic problems caused by Parking Guys, traffic was not the only detriment cited by opponents as a rationale for denying the permit. There were accounts of parking violations and near miss incidents involving pedestrians. These matters, too, go to "the public safety, health and welfare of the inhabitants of Nashville and Davidson County." Contrary to Parking Guys' adamant position, we do not believe any particular expertise is required for neighbors to state what they saw. It is competent evidence all the same. One rational conclusion, perhaps among others, to be drawn from this evidence is that granting Parking Guys a valet parking permit for this rather narrow, bustling street would be detrimental to public safety, health and welfare. Parking Guys, in effect, asks us to reweigh the evidence, and this we may not do under common-law writ of certiorari review.

We do not hold herein that the Commission made the best or wisest decision. We hold only that there was material evidence to support the Commission's decision, and that its decision was not arbitrary. We affirm the judgment of the Trial Court.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, The Parking Guys, Inc., and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE