FILED

10/13/2025

Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 8, 2025 Session

## MATTHEW LONG v. CHATTANOOGA FIRE AND POLICE PENSION FUND

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Hamilton County**
No. 21-0179      Jeffrey M. Atherton, Chancellor

---

### No. E2022-01151-SC-R11-CV

---

Matthew Long applied for disability pension benefits from the Chattanooga Fire and Police Pension Fund. After a hearing by the Fund's Board of Trustees, his application was denied. Mr. Long sought judicial review. The trial court reviewed the denial of benefits under Tennessee's Uniform Administrative Procedures Act ("UAPA") and held that the Board's interpretation of the Pension Benefits Policy was arbitrary and capricious and unsupported by sufficient and material evidence. The trial court reversed the Board's decision and awarded Mr. Long benefits. The Court of Appeals affirmed the trial court, holding that the court had subject-matter jurisdiction over the case and that the Board's decision was arbitrary and capricious. The Court of Appeals found the Policy ambiguous and construed it liberally in favor of Mr. Long. On appeal to this Court, the Fund challenges the reversal of the Board's decision. We conclude that the Court of Appeals erred in finding the Policy ambiguous and in construing it liberally. We hold that under a fair reading of the Policy, the Board's decision was not arbitrary and capricious, unsupported by sufficient and material evidence, or otherwise reversible under the UAPA. Accordingly, we reverse the judgments of the Court of Appeals and the trial court. We remand to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Remanded to the Trial Court**

MARY L. WAGNER, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, SARAH K. CAMPBELL, and DWIGHT E. TARWATER, JJ., joined.

Christopher A. Crevasse, James T. Williams, Robert F. Parsley, and Jessica M. Wolinsky, Chattanooga, Tennessee, for the appellant, Chattanooga Fire and Police Pension Fund.

Janie Parks Varnell and Logan Davis, Chattanooga, Tennessee, for the appellee, Matthew Long.

Nathan L. Kinard and Peter A. Newman, Chattanooga, Tennessee, for the Amicus Curiae, National Conference on Public Employee Retirement Systems.

## OPINION

### I.  FACTUAL AND PROCEDURAL HISTORY

Matthew Long was employed as a firefighter with the Chattanooga Fire Department for fifteen years before he applied to the Chattanooga Fire and Police Pension Fund ("Fund") for disability pension benefits.  The denial of Mr. Long's application is the subject of this appeal.

*The Fund and the Policy*

The Fund is a pension plan providing retirement, disability, and death benefits to employees of the City of Chattanooga's ("City") fire and police departments.  The Fund was established by the City Council and is governed by the Chattanooga City Code ("City Code").  The City Code establishes sources of revenue for the Fund, provides rules for distribution of benefits, and establishes the Board of Trustees ("Board") to administer the Fund and decide all applications for benefits.  As relevant to this case, the City Code provides benefits for job-related disabilities including mental health disorders such as Post-Traumatic Stress Disorder ("PTSD").

The City Code provides certain benefits only when a disability is "job-related."  A "job-related disability" is "[a] disability from injury or illness resulting from performance of duties."  The City Code later defines "disability" and provides some limitation to pensions for disabilities from mental health disorders:

> For purposes of a job related disability, the term "disabled" or "disability" shall mean a medically determinable impairment proven by satisfactory, objective proof, which in the sole opinion of the Board prevents such member from performing duties in the Fire or Police Department.  Notwithstanding the foregoing, if a member is granted a disability for a mental health disorder, including but not limited to Post-Traumatic Stress Disorder, such member shall be removed from the pension rolls if such member goes to work, either on a paid or volunteer basis, as a paramedic, emergency medical technician, rescuer or in any other position referred to as a "first responder[.]"

The City Code provides no other guidance specific to mental health disorders.

2

The City Code defines the makeup and authority of the Board. The Board consists of eight members: three active members of the police department, three active members of the fire department, the mayor or the mayor's appointee, and a member appointed by the City Council. The City Code gives the Board the authority to decide all benefits applications, interpret the relevant portions of the City Code, and create rules and regulations for the Fund, so long as the rules are consistent with the City Code. The Board-created rule at issue in this case is the Chattanooga Fire and Police Fund Disability Benefit Policy ("Policy").

The Policy provides procedures for filing and reviewing applications for disability benefits. Applications must include a physician's statement that the applicant can no longer perform their duties due to a disability and a statement from the City that they cannot accommodate the disability. The Board then conducts a hearing to determine whether the applicant has met the requirements for disability benefits.

At issue in this case are the Policy's additional requirements for mental health disability benefits:

> To qualify for a job-related disability based on a mental health disorder, including but not limited to Post Traumatic Stress Disorder ("PTSD"), Applicants must provide evidence satisfactory to the Board which shows:
>
> > 1. that the Applicant is permanently mentally or physically incapacitated from performing his/her usual duties or any other duty in their respective department;
> >
> > 2. that the disability is a direct result of a traumatic event that is
> >
> > > a. identifiable as to time and place
> > > b. undesigned and unexpected, and
> > > c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
> >
> > 3. that traumatic event occurred during and as a result of the Applicant's regular or assigned duties;
> >
> > 4. symptoms that have arisen in response to that traumatic event are aggravated by performing a Participant's regular or assigned duties;

5. that the disability was not the result of the Applicant's willful negligence; and . . . .

If the Applicant is seeking a disability retirement based on a mental health disability caused by a mental stressor without any physical impact or injury, the Applicant must establish that the disability result(s) from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the Applicant or another person.

Mr. Long's application was subject to these requirements because he sought disability benefits for a mental health disorder alone, without any physical injury.

*Mr. Long's Career and Disability*

Mr. Long joined the Chattanooga Fire Department as a firefighter in 2005. To become a firefighter, he received training in emergency medical care, hazardous materials handling, firefighting, rescue and extraction, and other emergency response skills. Mr. Long testified that the training included preparation for fires, medical emergencies, and car wrecks, but did not include graphic depictions of injuries and death. Mr. Long was promoted to Senior Firefighter in 2007 after earning several certifications related to firefighting and emergency response.

Mr. Long responded to many emergency calls over the course of his career. This case focuses on four traumatic events that Mr. Long identifies as contributing to his disability.[1] We will discuss them in the order they occurred.

The first event Mr. Long identified was a car accident near the Bailey-Willow intersection in 2008. Mr. Long was called to the scene of a car wreck involving a mother and three children. Mr. Long testified that the mother had run a red-light and been T-boned by an SUV. The children, including an infant in a car seat, were not buckled in when the wreck occurred. Mr. Long rendered aid to the infant whose skull had been crushed after the car seat bounced around the car as well as to a young girl who had been thrown out of the car. Two of the three children died from their injuries. Mr. Long noted that this incident was deeply troubling to all the firefighters who were on the call and that it was particularly hard for him because his children were about the same age as the children in the wreck.

---

[1] Mr. Long's initial application for disability benefits only listed the first two events, the Bailey-Willow wreck and the Highland Park fire. In a discussion with the Fund Administrator when he submitted his initial application, Mr. Long discussed these two events and the third event, the pedestrian struck by a car. In his benefits hearing before the Board, Mr. Long testified to the first two events and the fourth event, the encounter with an armed man. Since it is not clear which events the Board considered in its determination, we will consider all four.

The second event Mr. Long identified was the Highland Park fire in 2013. Mr. Long was called to a fire at an apartment where two children were trapped in the burning building. Mr. Long rendered aid to one of the children and remembered that the child's hair was "sloughing off," his "skin was hanging," and he was "covered in soot." Mr. Long and the other firefighters revived the child and then sent him in an ambulance for further treatment. Unfortunately, the other child died at the scene.

Mr. Long also discussed the aftermath of the Highland Park fire. More than a year after the fire, the surviving child came to visit the fire station to thank Mr. Long and the other firefighters. Mr. Long did not know in advance that the child was coming to visit, and the child was "so disfigured that . . . it was something that stuck with [Mr. Long]." Mr. Long also testified that he rarely learned anything about the people he helped and the child "was one of the few" he ever saw again.

The third event was a pedestrian being struck by a car.[2] Mr. Long was one of the responders to an accident where a man was hit by a car while pushing his girlfriend out of the way. The man died on the scene after "spitting out pieces of his lungs." Mr. Long found this particularly troubling because the man's friends and girlfriend were asking Mr. Long if the man would be okay.

The fourth event was an encounter with an armed man in July 2019. Mr. Long and other firefighters responded to a call that an elderly woman had fallen. When they arrived, Mr. Long came upon a man cutting pills. The man had a handgun out on the table and looked at Mr. Long in a way that made him feel threatened, particularly because the call was without police backup. Mr. Long testified of this encounter, "I've seen people with guns and different things, but at this moment I was done." This event occurred around the time that Mr. Long began mental health treatment.

In July 2019, Mr. Long told his supervisor that he needed help with his mental health and reached out to the City's Employee Assistance Program. Mr. Long also saw a medical provider who reported that he was depressed, anxious, and had trouble sleeping. He began receiving counseling including Eye Movement Desensitization and Reprocessing Therapy.

In November 2019, at the request of the Fire Department, Dr. Keith Caruso performed a fitness for duty evaluation of Mr. Long. Mr. Long discussed all four of the events described above in an interview with Dr. Caruso. Dr. Caruso diagnosed Mr. Long with chronic PTSD and recommended that Mr. Long attend an inpatient PTSD treatment program for firefighters. In February 2020, Mr. Long completed treatment at the Center for Excellence in Maryland and then returned home. Mr. Long continued receiving care from primary care providers but reported difficulty finding satisfactory follow-up mental health care. In June 2020, Dr. Caruso again evaluated Mr. Long's fitness for duty and

---

[2] It is unclear from the record when this event occurred.

determined that Mr. Long was "permanently and totally disabled as a firefighter." Based on this evaluation, the Fire Department sent Mr. Long a letter notifying him that he was no longer able to perform the essential functions of a Senior Firefighter and placing him on leave. A week later Mr. Long submitted his application for disability benefits.

*Procedural History*

Mr. Long submitted a claim for disability benefits on July 27, 2020. The next day, Mr. Long met with the Fund Administrator to complete his application. During this meeting, the Administrator also explained the application evaluation process culminating in a hearing before the Board.

The Board conducted a hearing to evaluate Mr. Long's application on January 21, 2021. During the hearing Mr. Long testified about his career, training, and PTSD treatment. Mr. Long agreed that he knew that he "might encounter children or elderly people that had been injured in fires" and that he "might encounter death as a firefighter." He was also asked if being a firefighter was what he expected; he responded "No, not in some of the ways" but then clarified that while he thought about being called to traumatic calls, he always hoped he would not be. Mr. Long also discussed the Bailey-Willow car wreck, the Highland Park Fire, and the encounter with the armed man. At the end of the hearing, the Board denied Mr. Long's application and provided a pre-printed form letter which stated the denial but not the reasons for the Board's decision.

In March 2021, Mr. Long filed his "First Application for Petition for Writ of Certiorari" in the Chancery Court of Hamilton County asking the court to reverse that the Board's denial under Tennessee Code Annotated section 4-5-322(h). Mr. Long specifically claimed that the Board's decision was "a) [a]rbitrary and capricious; b) [c]haracterized by an abuse of discretion; and c) [c]learly unwarranted exercise of discretion" and that the denial was "unsupported by evidence which is both substantial and material in light of the entire record." The Fund argued that denial was valid because Mr. Long's "disability could probably be successfully corrected by medical treatment he refused," and because he "failed to meet the eligibility qualifications for benefits related to a mental health job-related disability."

The trial court reversed the Board's decision. As to the Fund's first argument, the trial court found Dr. Caruso's fitness for duty report to be compelling evidence that Mr. Long's disability likely could not be corrected and that there was no substantial evidence that it could be corrected. On the second argument, the discussion hinged on the interpretation of the "unexpected" requirement in the Policy. The court read the Policy to mean that "*the event*, not the *type* of event" must have been unexpected and found "no evidence that . . . the events giving rise to [Mr. Long's] PTSD were expected in any sense." Additionally, the court treated the Policy as "a contract of adhesion" which is "construed against the drafter in favor of finding coverage." The court reasoned that the Board's

6

decision "arbitrarily invent[ed] exceptions to the Policy" and that applying their definition of "unexpected" would "allow exceptions to swallow the rule." Ultimately, the court held that the Board's decision was arbitrary and capricious and that the record lacked "sufficient and material evidence" for a "reasonable person to conclude that the events experienced by [Mr. Long] were unexpected." Accordingly, the court reversed the Board's decision, and the Fund appealed.

The Fund raised two issues before the Court of Appeals that are relevant to this appeal.[3] First, "[w]hether the trial court had subject matter jurisdiction over the case in light of *Phillips v. Chattanooga Fire & Police Pension Fund*, No. E2022-00296-COA-R3-CV, 2022 WL 16579684 (Tenn. Ct. App. Nov. 2, 2022)." *Long v. Chattanooga Fire & Police Pension Fund*, No. E2022-01151-COA-R3-CV, 2023 WL 8716539, at *7 (Tenn. Ct. App. Dec. 18, 2023), *perm. app. granted*, (Tenn. May 16, 2024). Second, "[w]hether the trial court erred by overturning the Board's decision to deny [Mr.] Long's disability benefits." *Id.*

In its principal brief before the Court of Appeals, the Fund contended that the court lacked subject-matter jurisdiction because the Board's denial did not "include conclusions of law, the policy reasons therefor, and findings of fact for all aspects of the order," and so "did not constitute a final, appealable order." *Long*, 2023 WL 8716539, at *7. The Fund conceded that the court had subject-matter jurisdiction in its reply brief because the administrative proceeding at issue did not meet the definition of a contested case and therefore the Fund was not required to comply with the UAPA under Tennessee Code Annotated section 27-9-114(a)(1). *Id.* The Court of Appeals found that under section 27-9-114(b)(1), "the UAPA's contested-case procedures don't apply to the Board's proceedings, even though judicial review remains governed by the UAPA." *Id.* Consequently, the Court of Appeals found that the trial court had subject-matter jurisdiction to review the Board's decision.

On the second issue, the Fund argued that the trial court erred because (1) "the traumatic events at issue were not 'unexpected' for a firefighter" and (2) "[Mr.] Long's PTSD could have been improved had he not quit his recommended treatment." *Long*, 2023 WL 8716539, at *9. The Court of Appeals reasoned that the Policy was ambiguous because the "Policy makes no effort to define the term 'unexpected,' nor is that term defined in any controlling legal authority or caselaw." *Id.* The court then applied the liberal construction

---

[3] The Fund raised a third issue that is not pertinent to this appeal: "[w]hether the trial court erred by denying the Motion to Alter or Amend the judgment." *Long v. Chattanooga Fire & Police Pension Fund*, No. E2022-01151-COA-R3-CV, 2023 WL 8716539, at *7 (Tenn. Ct. App. Dec. 18, 2023), *perm. app. granted*, (Tenn. May 16, 2024). The Fund had filed a motion to alter or amend the trial court's ruling based on temporary benefits that Mr. Long received from the City and an independent medical examination of Mr. Long that the City had ordered. *Id.* at *12. The Court of Appeals found that the trial court had properly denied the motion to alter or amend. *Id.* at *12–13. The Fund did not appeal this finding, and it has no bearing on this appeal.

7

doctrine under which "pension and retirement plans are liberally construed in favor of the employee, it being the general rule that pension plans formulated by the employer are to be construed most strongly against the employer." *Id.* (quoting *Simmons v. Hitt*, 546 S.W.2d 587, 591–92 (Tenn. Ct. App. 1976)). Accordingly, the court found that it was required "to construe the [Policy] language strictly in favor of the employee" and "agree[d] with the trial court's decision that the Board's denial of [Mr.] Long's application is arbitrary and capricious." *Id.* at *10, *11. On the second argument, the Court of Appeals found that there was "no substantial or material evidence in the administrative record that [Mr.] Long's PTSD 'could probably be successfully corrected by competent medical treatment' and that [Mr.] Long refused to participate in such treatment."[4] *Id.* at *12. Agreeing that the Board's decision was arbitrary and capricious, the Court of Appeals affirmed the judgment of the trial court. *Id.* at *11–13. The Fund then appealed to this Court.

There are four issues on appeal before this Court. First, whether the Court has subject-matter jurisdiction over this case under Tennessee Code Annotated section 27-9-114. Second, whether the Court of Appeals erred in applying the liberal construction doctrine and requiring that pension statutes and plans must be liberally construed in favor of applicants for benefits. Third, whether the Court owes any deference to the Board's interpretation of the Policy. Fourth, whether the Court of Appeals erred in finding the Board's denial of Mr. Long's application arbitrary and capricious.

## II.     ANALYSIS

### *Subject-Matter Jurisdiction*

As a threshold matter, we consider the issue of subject-matter jurisdiction. While the parties agree that this Court has subject-matter jurisdiction, an "appellate court *must* consider subject-matter jurisdiction, regardless of whether that issue was presented by the parties or addressed below." *State v. Bristol*, 654 S.W.3d 917, 926 (Tenn. 2022) (emphasis in original). We review questions of subject-matter jurisdiction "de novo without a presumption of correctness." *In re Est. of Trigg*, 368 S.W.3d 483, 489 (Tenn. 2012). In this case, the question of subject-matter jurisdiction is grounded in Tennessee Code Annotated section 27-9-114, which outlines the requirements for civil service boards conducting employment hearings and judicial review of their decisions. The section provides, in relevant part:

> (a)(1) Contested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the

---

[4] The Fund did not appeal the Court of Appeals' finding on this argument.

Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3.

. . . .

(b)(1) Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322.

Tenn. Code Ann. § 27-9-114 (2017).

Subsection (a)(1) requires civil service boards to follow the UAPA's contested case procedures in "*contested case hearings* . . . which affect the employment status of a civil service employee." *Id.* (emphasis added). Subsection (b)(1) applies more broadly. It requires "[j]udicial review of *decisions* by civil service boards . . . which affects the employment status of a county or city civil service employee" to follow the judicial review standards of the UAPA. *Id.* (emphasis added). Unlike subsection (a)(1), subsection (b)(1) is not limited to contested case hearings. Accordingly, subsection (a)(1) only applies to contested cases hearings, while subsection (b)(1) applies to all civil service board decisions that affect employment status, regardless of whether the decision was made following a contested case hearing. *See id.*

There has been some confusion about the correct application of subsections 27-9-114(a) and (b), stemming from misapplication of this Court's decision in *Tidwell v. City of Memphis*, 193 S.W.3d 555 (Tenn. 2006). In *Tidwell,* we reviewed whether Tennessee Code Annotated section 27-9-114 applies to a hearing by a city's "On the Job Injury Appeals Panel ('OJI Panel')." 193 S.W.3d at 558–63. The Court of Appeals had "concluded that the City's OJI Panel was not subject to the provisions of section 27-9-114 because it was not a civil service board." *Id.* at 558. This Court reversed; we found that (1) the OJI Panel was a civil service board, and (2) the decision of the OJI Panel affected the employment status of the employees at issue. *Id.* at 563–64. Consequently, we concluded that section 27-9-114 applied to the proceedings of the OJI Panel and judicial review of its decisions was governed by the UAPA. *Id.* at 564. In *Tidwell,* whether the OJI Panel proceeding met the requirements of a contested case was not at issue. *See id.* at 564 n.10. The Court explained that "if section 27-9-114 does apply, the UAPA governs," but we did not discuss the difference between subsections (a)(1) and (b)(1). *Id.* at 560. Unfortunately, this line from *Tidwell* has been subsequently misapplied.

Decisions applying *Tidwell* have conflated the contested case requirements and judicial review requirements of subsections 27-9-114(a) and (b). For example, in *Phillips,* the Court of Appeals faced facts nearly identical to those before us here and examined the requirements of section 27-9-114. *Phillips v. Chattanooga Fire & Police Pension Fund*, No. E2022-00296-COA-R3-CV, 2022 WL 16579684 (Tenn. Ct. App. Nov. 2, 2022). The

Court of Appeals affirmed the trial court's holding that it lacked subject-matter jurisdiction because there was not a UAPA-compliant final order. *Id.* at *7. The *Phillips* court held that "the UAPA applies to [the] claim for disability benefits, and the [civil service board] was required to provide a UAPA-compliant contested case hearing." *Id.* at *6 (internal quotation marks omitted). Citing *Tidwell*, the *Phillips* court explained that "if the UAPA applies, it applies at all stages of the proceedings from the board through the appellate process." *Id.* (citing 193 S.W.3d at 559). This overstates our holding in *Tidwell*. In many cases, such as *Tidwell*, both subsections (a)(1) and (b)(1) apply, but some cases only implicate subsection (b)(1).

This Court discussed the difference between subsections 27-9-114(a) and (b) in *Davis v. Shelby County Sheriff's Department*, 278 S.W.3d 256 (Tenn. 2009). In *Davis*, the county in question was "a home rule jurisdiction, and as such, Tennessee Code Annotated section 27-9-114(a)(2) exempt[ed] the [civil service board] from the UAPA's contested case hearing procedures" required by subsection (a)(1).[5] 278 S.W.3d at 263. However, exemption from the requirements of subsection (a)(1) does not affect judicial review of a civil service board's decisions under subsection (b)(1). *Id.* So, even when a civil service board is not required "to conduct its hearing 'in conformity with [the] contested case procedures under the [UAPA],' the [b]oard's decision must be reviewed in conformity with the judicial review standards under the [UAPA]." *Id.* at 264 (cleaned up) (quoting Tenn. Code Ann. § 27-9-114). We follow the same principle when (a)(1) does not apply because the case in question does not meet the UAPA's definition of a contested case.

In sum, subsections (a)(1) and (b)(1) of section 27-9-114 are different and should be considered independently. Under subsection (a)(1), a hearing by a civil service board is required to be "conducted in conformity with contested case procedures under the [UAPA]" if (1) the hearing meets the UAPA's definition of a contested case, and (2) the hearing "affect[s] the employment status of a civil service employee." § 27-9-114(a)(1). Under subsection (b)(1), judicial review of a decision by a civil service board is required to be "in conformity with the judicial review standards under the [UAPA]" if the decision "affects the employment status of a county or city civil service employee." § 27-9-

---

[5] Section (a) provides in full:

(a)(1) Contested case hearings by civil service boards of a county or municipality which affect the employment status of a civil service employee shall be conducted in conformity with contested case procedures under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 3.

(2) The provisions of subdivision (a)(1) pertaining to hearings by civil service boards shall not apply to municipal utilities boards or civil service boards of counties organized under a home rule charter form of government.

Tenn. Code Ann. § 27-9-114. Subsection (a)(2) is not applicable to this case.

114(b)(1). There is no contested case requirement for judicial review under the UAPA of a civil service board's decision.

Here, the parties correctly agree that Mr. Long's hearing before the Board was not a contested case as defined by the UAPA. A contested case is a "proceeding . . . in which the legal rights, duties or privileges of a party are required by any statute or constitutional provision to be determined by an agency after an opportunity for a hearing." Tenn. Code Ann. § 4-5-102(3) (2021). No statute or constitutional provision required the Board to conduct a hearing in Mr. Long's case. The hearing was conducted pursuant to the Policy, which provides that "the Board may conduct a disability hearing" but the disability hearing is not required. Therefore, this was not a contested case, and the hearing was not required to be "conducted in conformity with contested case procedures under the [UAPA]." § 27-9-114(a)(1). Findings of fact and conclusions of law are helpful for judicial review and always recommended. But because the Fund's proceedings were not required to be conducted pursuant to the UAPA, no such findings are required to confer subject-matter jurisdiction for judicial review. Therefore, we affirm the finding of the Court of Appeals that the Court has "subject matter jurisdiction over this dispute pursuant to section 27-9-114(b)." *Long*, 2023 WL 8716539, at *7.

*Interpretation of Agency Rules*

The remaining issues in this appeal address the interpretation and application of the Policy, and the Court's review thereof. At the heart of this dispute is the Policy requirement that, to be eligible for benefits, a mental health "disability [must be] a direct result of a traumatic event that is . . . unexpected." Specifically, what does it mean for a traumatic event to be "unexpected" as required by the Policy?

The Court of Appeals found the term ambiguous, applied the liberal construction doctrine, and then construed the Policy in favor of Mr. Long. *Long*, 2023 WL 8716539, at *9–11. The Fund disputes the finding of ambiguity and also argues that the Court should defer to the Board's interpretation of the Policy. We hold that the Policy is not ambiguous, and we interpret it according to its unambiguous plain meaning.

*i.*

A court may only find a regulation ambiguous after exhausting all tools of construction. A text is "ambiguous when it is subject to differing interpretations which yield contrary results" but ambiguity does not exist "merely because parties proffer different interpretations" of the term. *Wallace v. Metro. Gov't of Nash. & Davidson Cnty.*, 546 S.W.3d 47, 53 (Tenn. 2018) (internal citation omitted). In the statutory context, "[w]hen a statute's meaning is clear and unambiguous after consideration of the statutory text, the broader statutory framework, and any relevant canons of statutory construction, we 'enforce the statute as written.'" *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022)

(quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013)). We give the words of the text their "natural and ordinary meaning in the context in which they appear and in light of the [text's] general purpose." *Davis v. Reilly*, 683 S.W.3d 739, 743 (Tenn. 2024) (quoting *Deberry*, 651 S.W.3d at 925). When a term is undefined in the text, "we may 'look to authoritative dictionaries' to determine the term's meaning." *Id.* (quoting *Deberry*, 651 S.W.3d at 925). The same approach should be followed with agency regulations.

The Court of Appeals found ambiguity because "the Policy makes no effort to define the term 'unexpected,' nor is that term defined in any controlling legal authority or caselaw." *Long*, 2023 WL 8716539, at *9. We decline to follow that reasoning; a term is not ambiguous merely because it is undefined.

At issue here is the meaning of "unexpected" in the Policy's requirement that a covered mental health "disability is [the] direct result of one or more traumatic events that are . . . unexpected." "Unexpected" is not a technical term or term of art; its meaning is straightforward. "Unexpected" means "[h]appening without warning; not expected." *Unexpected*, *Black's Law Dictionary* (12th ed. 2024). "Expected" means "[a]nticipated, regarded as probable or likely; predicted." *Expected*, *Oxford English Dictionary* (March 2025), https://doi.org/10.1093/OED/6825239285. So, an event is "unexpected" if it is not anticipated or predicted or if it is not regarded as probable or likely.

It is helpful to view the Policy's requirements together to understand the term "unexpected" in context. The Policy requires, in relevant part:

> 2. that the disability is [a] direct result of *one or more traumatic events* that are
>     a. identifiable as to time and place
>     b. un-designed and *unexpected*, and
>     c. caused by circumstances external to the Applicant . . .; [and]
>
> 3. that [the] traumatic event(s) occurred during and as a result of the *Applicant's regular or assigned duties*.

Under a fair reading of the entire provision, to sustain a disability claim the traumatic events in question must not be anticipated or regarded as probable within the normal course of the Applicant's regular or assigned duties.

It is not this Court's role to create ambiguity, and we see no ambiguity here. We hold that the Court of Appeals erred in finding the term "unexpected" ambiguous as used in the Policy. The Board's interpretation is consistent with a fair reading of the plain language of the Policy.

12

Mr. Long argues that the liberal construction doctrine should control the interpretation of the Policy. The Court of Appeals agreed and applied the liberal construction doctrine after finding the term "unexpected" ambiguous. *Long*, 2023 WL 8716539, at *11. We disagree. This Court first invoked the liberal construction doctrine for pension plans over eighty years ago in *Collins v. City of Knoxville*, stating that "statutes creating pensions are remedial in their nature and are to be liberally construed in favor of the applicants for pensions, as a matter of sound public policy." 176 S.W.2d 808, 811 (Tenn. 1944). Subsequently, however, this Court made clear that the liberal construction doctrine does not apply when the pension plan is unambiguous. *Wyckoff v. Bd. of Admin. of Ret. Sys. of Memphis*, 348 S.W.2d 289, 290 (Tenn. 1961). As discussed above, we find the Policy to be unambiguous. Because the policy is unambiguous, the liberal construction doctrine cannot apply.[6]

*iii.*

We turn now to whether the Court must defer to the Board's interpretation of the Policy. The Fund asserts that this Court should defer to the Board's interpretation. In support of this argument, the Fund contends that the UAPA and the Chattanooga City Code require deference. *See* Tenn. Code Ann § 27-9-114; *Chattanooga, Tenn., Code of Ordinances* ch. 2, art. III, div. 5, § 2-408 (2018), https://perma.cc/MDJ6-NW5G. The Fund also cites to this Court's decision in *Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, wherein this Court held that "courts must give great deference and controlling weight to an agency's interpretation of its own rules." 486 S.W.3d 496, 528 (Tenn. 2016) (first quoting *Jackson Express, Inc. v. Tenn. Pub. Serv. Comm'n*, 679 S.W.2d 942, 945 (Tenn. 1984); and then citing *Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 522 (Tenn. 2013) (other citation omitted)).[7]

---

[6] We express no opinion on the continued utility of the liberal construction doctrine.

[7] This Court first discussed deference to an agency's interpretation of its own rules in *Jackson Express, Inc. v. Tennessee Public Service Commission*, 679 S.W.2d 942 (Tenn. 1984). In *Jackson Express*, this Court adopted the federal approach regarding judicial deference to agency interpretations of regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The propriety of *Auer* deference has been strongly criticized. *See Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 616–21 (2013) (Scalia J., concurring in part, dissenting in part); *Kisor v. Wilkie*, 588 U.S. 558, 592–93 (2019) (Gorsuch, J. concurring in the judgment). Indeed, states across the country have begun to step away from such deference. *See generally* Daniel Ortner, *The End of Deference: How States are Leading a (Sometimes Quiet) Revolution Against Administrative Deference Doctrines*, Pac. Legal Found. (Mar. 11, 2020), https://dx.doi.org/10.2139/ssrn.3552321. Some have rejected it through the courts. *See, e.g.*, *Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 319 So. 3d 1049 (Miss. 2021); *Woessner v. Labor Max Staffing*, 471 P.3d 1 (Kan. 2020). Others have adopted statutory changes overturning such deference. *See, e.g.*, Ariz. Rev. Stat. Ann. § 12-910(F) (West, Westlaw through legislation of the First Regular Session of the Fifty-Seventh Legislature (2025)); Wis. Stat. Ann. §

This Court, however, need not decide whether deference should apply. As discussed above, the Board applied a definition of "unexpected" that is consistent with the unambiguous plain meaning of the text. Whether we defer or not, the result is the same. Without addressing deference, we affirm the Fund's interpretation of the Policy.

*Judicial Review of the Board's Decision*

The final issue before us is whether the Board's decision survives judicial review under the UAPA. The UAPA provides five bases for a court to reverse or modify an agency's decision:

> The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) (A) Unsupported by evidence that is both substantial and material in the light of the entire record;
>
> > (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h) (2015 & Supp. 2020).[8] Mr. Long argues that the Board's decision was arbitrary and capricious, characterized by an abuse of discretion, characterized by a clearly unwarranted exercise of discretion, and unsupported by evidence which is both substantial and material in light of the entire record. *Long*, 2023 WL

---

227.10(2g) (West, Westlaw through 2025 Act 15). Tennessee has also begun to whittle away at deference through statutory changes. *See* Tenn. Code Ann. § 4-5-326 (Supp. 2024) (requiring de novo review with no deference in judicial review of a state agency's interpretation of a statute or rule in a contested case). Here, the result is the same whether or not we defer to the Board's interpretation of the Policy. So, this Court need not decide today whether Tennessee should eliminate deference to a local agency's interpretation of its own rules or in matters that are not contested cases.

[8] As the Court of Appeals noted below, the General Assembly amended section 4-5-322(h) for "disciplinary actions taken or information first received on or after the effective date of May 18, 2021." *Long*, 2023 WL 8716539, at *7 (citations omitted). Because Mr. Long submitted his claim in July 2020 and his petition in March 2021, the amended version of the code is not applicable here.

8716539, at *8.  We therefore review whether the Board's decision should be affirmed, modified, or reversed under only subsections (4) or (5) of section 4-5-322(h).[9]

The abuse of discretion standard contains the substantial and material evidence standard, and both fall within the UAPA's "'narrow and deferential' standard for judicial review of administrative decisions." *Taylor v. Bd. of Admin., City of Memphis Ret. Sys.*, 681 S.W.3d 751, 754 (Tenn. 2023) (quoting *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 668 (Tenn. 2016)).  "A decision of an administrative agency is arbitrary or capricious when there is no substantial and material evidence supporting the decision." *Moss v. Shelby Cnty. Civ. Serv. Merit Bd.*, 665 S.W.3d 433, 441 (Tenn. 2023) (quoting *StarLink*, 494 S.W.3d at 669).  "Substantial and material evidence is less than a preponderance of the evidence and more than a scintilla or glimmer of evidence." *Moss*, 665 S.W.3d at 441 (internal quotation marks omitted).  "A decision with evidentiary support can be arbitrary or capricious if it amounts to a clear error in judgment and is not based on any course of reasoning or exercise of judgment or disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (internal citations omitted) (cleaned up).

The Policy requires that "Applicants must provide evidence satisfactory to the Board which shows . . . that the [Applicant's mental health] disability is a direct result of a traumatic event that is . . . unexpected."  Applying the plain meaning of the term "unexpected" in the context of the Policy, the traumatic events in question must not be anticipated or regarded as probable within the normal course the Applicant's regular or assigned duties.  For Mr. Long, these are the regular or assigned duties of a Senior Firefighter.

The first event that Mr. Long identified in his application was the Bailey-Willow car wreck.  This was a particularly horrific car wreck involving dead and injured children; it was "one that got everybody."  But Mr. Long's application and testimony do not include evidence that the Bailey-Willow car wreck was unexpected within his normal course of duties.

---

[9] We do not address whether the Policy's "unexpected" requirement is consistent with the definition of "job related disability" in the City Code.  Under the City Code, a "job related disability" is "[a] disability from injury or illness resulting from performance of duties." *Chattanooga, Tenn., Code of Ordinances* ch. 2, art. III, div. 5, § 2-410(a)(2) (2019), https://perma.cc/6BK9-ZBBR.  As defined by the City Code, a disability is "a medically determinable impairment proven by satisfactory, objective proof, which in the sole opinion of the Board prevents such member from performing duties in the Fire or Police Department." *Id.* § 2-410(f)(5).  There is no "unexpected" requirement in the City Code. Neither party raised the issues of whether the "unexpected" requirement violated the City Code's provisions or was in excess of the authority granted to the Board by the City Code, so we do not address them here. *See* Tenn. Code Ann. § 4-5-322(h)(1)–(2).  We confine our review to the issues raised by the parties.  Tenn. R. App. Proc. 13(b) ("Review generally will extend only to those issues presented for review.").

The second event that Mr. Long identified in his application was the Highland Park fire. This event was also horrifying, but again, neither Mr. Long's application nor his testimony at the hearing indicated that this event was unexpected within his normal course of duties. The closest Mr. Long came to testimony that the event was unexpected was his statement that the Highland Park fire was worse than usual, "different than a lot" of the fires he was called to. But worse than usual is not necessarily unexpected.

The Highland Park fire also had a difficult aftermath when the surviving child from the fire visited Mr. Long and the other firefighters at the fire hall. Mr. Long's testimony included some evidence that the visit was unexpected; he testified that he "didn't even know [the child] was coming by" and that "[y]ou never see these people again." Mr. Long seems to have found this event unexpected, but reasonable minds could differ. A rescued victim returning to thank a firefighter could be anticipated or regarded as probable within the normal course of a firefighter's duties.

Mr. Long also asks us to consider the call when a pedestrian was struck by a car, though he did not include this event in his initial application or discuss it in the hearing. Again, Mr. Long identified this event as traumatic but not as unexpected.

The final event was the encounter with an armed man in July 2019. Mr. Long was not expecting to encounter an armed man during that specific call. However, he also testified, "I've seen people with guns and different things, but at this moment I was done," indicating that encounters with armed people are an expected part of the job. Additionally, Mr. Long did not identify this as an event causing his PTSD in his application or testimony.

More generally, Mr. Long discussed his training and experience as a firefighter. He discussed how he was trained to respond to fires, medical emergencies, and car wrecks but also explained that the training did not show the graphic nature of the accidents, injuries, and death he encountered as a firefighter. However, he also made it clear that he expected to encounter burned children, other injured victims, and even death. Additionally, when asked if being a firefighter is what he expected, he responded in part that while he always hoped not to be called to the kind of traumatic calls he identified, he had thought about the possibility of responding to those calls. This tends to indicate that the traumatic events causing Mr. Long's PTSD were horrible and traumatic but not unexpected within his normal course of duties.

Mr. Long's arguments tend to focus not on the nature of the events themselves, but rather on his unexpected response to those events. When asked at oral argument about evidence in the record that these events were "unexpected," counsel cited Mr. Long's medical records and described the effect these events had on Mr. Long, i.e., the PTSD. While he may not have expected to experience PTSD, that does not make the events themselves unexpected within his normal course of duties.

There is little evidence that the events causing Mr. Long's PTSD were "unexpected," and there is significant evidence that the events were expected. There is certainly "more than a scintilla of evidence" to support the Board's decision. The Policy placed the burden of proof on Mr. Long to show that the events causing his PTSD were unexpected, and our review of the record yields little evidence that he met that burden. Accordingly, we find that the Board's decision is supported by substantial and material evidence in the record and there is ample basis for a reasonable person to reach the same conclusion. We also see no evidence that the Board's decision was a clear error in judgment, nor any other evidence of an arbitrary or capricious decision, abuse of discretion, or a clearly unwarranted exercise of discretion. Therefore, the Board's decision should not have been reversed.

### III. CONCLUSION

For these reasons, we reverse the decision of the Court of Appeals. We hold that the term "unexpected" in the Policy is not ambiguous and the liberal construction doctrine does not apply. Further, the Board's decision was not arbitrary and capricious or otherwise reversible. Therefore, we reverse the judgments of the Court of Appeals and the trial court. This case is remanded to the Chancery Court for Hamilton County for further proceedings consistent with this opinion.

_____

MARY L. WAGNER, JUSTICE